

**STATE OF MAINE**
DEPARTMENT
OF THE
**SECRETARY OF STATE**

SHENNA BELLOWS
SECRETARY OF STATE

August 8, 2025

**Via U.S. Mail & E-mail**

Michael E. Gates, Esq.
Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave., NW – 4CON
Washington, DC 20530

        Re:    Your correspondence of July 24, 2025

Dear Attorney Gates:

      I write in response to your letter of July 24, 2025, making sweeping and unexplained requests for information and records concerning Maine voters. As Maine's chief election officer, I have a responsibility to protect the sensitive personal information of Maine voters. I have grave concerns about the seemingly overbroad scope of the Department of Justice's information and records requests, which do not appear to be correlated with legitimate investigatory needs. Under Article I of the Constitution, the administration of federal elections is entrusted to the States. While Congress has adopted federal laws such as the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act (HAVA) as an overlay to those state laws, those federal laws do not supplant states as the administrators of federal elections, nor do they grant the Department of Justice (DOJ) authority to second-guess individual voter eligibility determinations by state and local officials.

      Given the surprising—indeed, to our knowledge, unprecedented—scope of DOJ's requests for information and records, I ask that DOJ please provide an explanation of why it is making these requests to Maine. If DOJ is investigating voters in Maine or state election administrators for potential violations of federal law, I ask that DOJ provide the specific federal laws that it believes may have been violated in Maine and all facts supporting DOJ's contentions.

      To the extent that DOJ's queries may be directed at Maine's obligations under the NVRA to establish systematic programs that make a "reasonable effort" to remove the names of ineligible voters, Maine satisfies and exceeds this federal requirement. Maine law authorizes

my department to conduct systematic maintenance of the central voter registration system. 21-A M.R.S.A. § 161(2-A). Since the inception of Maine's central voter registration system (CVR) in 2007, my Department's Bureau of Corporations, Elections and Commissions (CEC) has engaged in a concerted program to keep Maine's voter registration data current and accurate. CEC routinely works with municipalities to identify and remove records of deceased voters, voters who have moved, and duplicate voter records. Municipalities review state death records on a monthly basis and cancel the records of voters who have died. In 2024, these routine list-maintenance practices resulted in cancellation of 22,611 registrations for reasons such as death, duplicate records, or relocation.

In addition to these routine maintenance activities, CEC has conducted periodic NVRA mailings to identify voters who are no longer eligible to vote at the address listed in CVR. Under CEC's current process, registrants are selected for address-confirmation mailings based on a lack of recent voter participation history. If a card is returned indicating that the voter has moved or died, their registration record is updated or cancelled accordingly. If the confirmation card is not returned, or returned undeliverable, the voter is designated inactive in the CVR system. The voter can restore their active status by voting in an election, signing a referendum petition, or otherwise demonstrating that they continue to reside at their registered address. If the voter has not restored their active status by the second federal election following the mailing, CEC cancels their registration.

CEC conducted such mailings using U.S. Postal Service National Change of Address (NCOA) data in 2007, 2009, 2011, and 2013. In each of these instances, CEC used NCOA data—which the NVRA expressly endorses as a reasonable approach to list maintenance—to select individuals to receive address-confirmation mailings. CEC also conducted list-maintenance activities in 2017 using data obtained from the Interstate Voter Registration Crosscheck Program, a program allowing for interstate sharing of voter registration data between participating states. When the Crosscheck program was suspended, the Maine Legislature in 2021 authorized Maine to join the Electronic Registration Information Center (ERIC), *see* 21-A M.R.S.A. § 161(2-B), which similarly allows for member states to cross check their voter registration data with those of other states. CEC has been using ERIC data to assist in its list-maintenance efforts since 2022. ERIC's membership agreement is publicly available at the following link: https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf.

In the summer of 2022, CEC conducted by far its largest address-confirmation mailing to date, sending postcards to over 248,000 registered voters in the CVR system. As a result of these mailings, 4,688 voter registrations were cancelled and 221,523 voter registrations were made inactive. Following the second federal election after the mailing, held on November 5, 2024, CEC cancelled the registrations of 180,584 voters who remained inactive following that election.

Collectively, the efforts detailed above have resulted in cancellation of 726,954 registrations between 2007 and 2025. That is more than 78% of the total number of active-status registrations contained in CVR at its creation.

In addition, in 2023 CEC completed implementation of automatic voter registration (AVR) at the Bureau of Motor Vehicles. Now, every time an eligible Maine resident visits a BMV branch for services, they are automatically given an opportunity to electronically register to vote or update their voter registration information. Over time, CEC expects AVR to further improve the accuracy and currency of Maine's voter rolls. In 2024, there were 20,042 AVR transactions, of which 7,857 resulted in updates to existing voter registration records.

With regard specifically to deceased voters, Maine has two programs to ensure that registrations are cancelled upon death. First, each month, Maine registrars are provided with death information from the State's Bureau of Vital Records. Registrars are trained to use this information to cancel the registrations of deceased voters within their jurisdictions. Second, on at least an annual basis, the ERIC program provides CEC with a list of registered Maine voters who may be deceased based on information contained in the Social Security Administration's Limited Access Death Master File. CEC reviews this information and cancels the registrations of deceased voters as appropriate.

A copy of CEC's 2024 report to the Maine Legislature concerning its list maintenance efforts, which provides additional detail concerning those efforts, is attached as Exhibit A.

I turn now to DOJ's more specific requests for information and records.

*Lists of Election Officials*

DOJ asks for a list of "election officials who are responsible for implementing Maine's general program of voter registration list maintenance from November 2022 through receipt of this letter," including local election officials. As Maine's chief elections officer and designated state coordinator under the NVRA and HAVA, I ultimately oversee Maine's compliance with these laws. Any communication concerning my department's compliance with federal law should be sent to me.

List maintenance at the local level is overseen by the registrar of each of Maine's roughly 480 municipalities. We maintain a public list of municipal clerks and registrars at this link: https://www.maine.gov/sos/elections-voting/find-a-municipal-clerk-or-registrar.

*Voter Registration List*

Invoking 52 U.S.C.A. § 20507(i), DOJ asks for the "current electronic copy of Maine's computerized statewide voter registration lists," including "all fields contained within the list." I am unable to comply with DOJ's request. Under Maine law, data contained within CVR is confidential and may not be disclosed except as specified by statute. 21-A M.R.S.A. § 196-A(1

Nor does the NVRA provision DOJ cites require such disclosure. In considering Maine's disclosure obligations under § 20507(i), the U.S. Court of Appeals for the First Circuit recently confirmed that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024). The Maine Legislature recently enacted a law recognizing certain CVR information as "highly sensitive information." See P.L. 2025, ch. 397, § 12.

In addition to the legal constraints on providing DOJ with the requested data, it is unclear what sort of investigation would necessitate production of a state's entire voter registration database, including fields containing highly sensitive personal information. The request seems particularly overbroad based on our understanding that DOJ has made identical requests of many other states. I therefore ask that DOJ please provide me with the following information: (1) DOJ's intentions for Maine's voter registration database, (2) whether DOJ intends to publicize or further disseminate personally identifying information of Maine voters, (3) whether personally identifying information of voters, including sensitive information such as drivers' license numbers and partial social security numbers, would be subject to public records requests under the Freedom of Information Act, (4) any examples prior to 2025 of DOJ demanding the entirety of a state's voter registration database as part of an investigation, and (5) how DOJ reconciles its request with its legal obligations under the Privacy Act of 1974 and the E-Government Act of 2002.

*Questions Regarding EAVS*

Your letter also asks various questions concerning Maine's submissions to the Election Administration and Voting Survey (EAVS). As an initial matter, EAVS is a program of the independent Election Assistance Commission (EAC), and Maine's obligation to report data concerning its elections runs to that agency, not the Department of Justice. *See* 11 C.F.R. § 9428.7. Were Maine's reporting to the EAC inadequate, we would expect to hear from the EAC. To date, we have not. To the extent your letter suggests that DOJ may enforce EAC reporting rules, I ask that you please provide the legal authority for such a claim.

1. *Registration rate*

Your first question suggests that Maine's rate of registered voters as a percentage of citizen voting age population is somehow too high. I reject the premise of DOJ's question. Maine's rate of 92.4 percent (as calculated by the EAC) is entirely consistent with Maine's longstanding high rates of civic engagement and voter participation. Moreover, as described above, Maine is complying with its obligation under federal law to operate programs that make reasonable efforts to maintain its voter lists, which just this year included cancellation of over 180,000 registrations based on change of residence. To the extent that DOJ contends that Maine's rate of voter registration is somehow improperly high, please provide the basis for DOJ's contention.

2. *Duplicate transactions*

Your letter makes assertions concerning the number and percentage of duplicate transactions in Maine—voter registration transactions in which an existing voter submits a registration application that makes no changes to their existing information in CVR. According to the 2024 EAVS survey, Maine's rate of transactions involving duplicate registrations is well within the norm, with more than half of states that submitted data reporting a lower percentage. Maine appears to be below the nationwide average only because a small number of states reported extremely high rates of duplicate applications, skewing the average rate upward.

Nor is there any reason to believe that Maine's rate of duplicate registrations indicates a problem with duplicate records in CVR. As a matter of common sense, one would expect few voters to submit registration forms that contain no updates to their existing information in CVR. Moreover, Maine has processes in place to ensure that duplicate applications do not result in duplicate voter registration records in CVR. Specifically, CEC trains registrars on proper handling of such duplicate applications. In addition, the CVR system itself contains a safeguard against creation of a duplicate voter record by requiring the operator to conduct a search for an existing record before a new record can be created.

Your question further asserts that Maine did not provide a response to Question A12h in the EAVS survey. This is incorrect. As reflected in the 2024 EAVS Report, Maine reported to the EAC that it had removed 2,900 records from CVR as duplicate records. In removing these records, election officials move any unique information, such as voter participation history, from the duplicate record to the primary record and then cancel the duplicate record.

3. *Confirmation notice data*

Your letter notes that Maine did not report data to EAVS on NVRA confirmation mailings. Maine did not report this data because its last confirmation mailing took place in June 2022, before the start of the EAVS reporting period.

Please see the narrative above for CEC's current procedure for NVRA address confirmation mailings.

4. *Cancellation data*

Please see the narrative above for CEC's practices concerning cancellation of voters based on NVRA address-confirmation mailings. As noted above, CEC earlier this year cancelled over 180,000 registrations as a result of its 2022 address-confirmation mailing.

5. *Removal of Voters based on Change of Residence*

While your letter appears to express concern about the allegedly high percentage of removals attributable to change in address, the basis for DOJ's concern is unclear. Maine registers voters at the municipal level rather than the county level and, as a result, cancellations of registrations due to moves between towns within the same county are common. In addition, Maine did not remove voters for failure to return NVRA mailings—one of the three categories of removals tracked by EAVS—until after the close of the reporting period. As a result, zero removals in that category are reflected in the EAVS report, skewing the other two percentages relative to other states that did perform such cancellations during the reporting period.

To the extent DOJ continues to have a concern about Maine's percentage of removals based on change of address in light of the explanation above, please explain the factual basis for its concern.

6. *Removal of Voters*

Please see the narrative above for Maine's process for identifying and removing deceased voters.

*Removal of Ineligible Voters*

Finally, your letter requests information concerning identification and removal of voters ineligible to vote by reason of citizenship, adjudicated incompetence, and felony conviction. Maine does not disqualify voters based on felony conviction. *See* 21-A M.R.S.A. § 111. Similarly, the Maine Constitution's restriction on voting for "persons under guardianship for reasons of mental illness" was struck down by a federal court as facially invalid. *See Doe v. Rowe*, 156 F. Supp. 2d 35, 50 (D. Me. 2001). Current Maine law expressly protects the right to vote of people under guardianship, allowing disqualification only upon a court finding that the "the adult cannot communicate, with or without support, a specific desire to participate in the voting process." 18-C M.R.S.A. § 5 310(2)(A). Such court orders are extremely rare and, if issued, would be enforced by the relevant municipal registrar.

With regard to citizenship, consistent with the NVRA's requirements, *see* 52 U.S.C.A. § 20508(b)(2)(B) & (3), Maine's registration application requires the applicant to certify that they are a U.S. citizen. CEC trains registrars to reject any voter registration application in which the prospective voter has not made the required certifications. In the event a question were to arise about the citizenship of a voter following registration, Maine law requires the applicable municipal registrar to notice and conduct a hearing to determine the voter's qualifications. *See* 21 A M.R.S.A. § 161(4). Making a false statement or taking a false oath concerning a voter's qualifications is a Class D crime subject to investigation and prosecution by the Office of Attorney General. 21-A M.R.S.A. §§ 33 & 159.

Our Constitution entrusts election administration to the States, not the federal government. I reiterate my deep concern with DOJ's unexplained request for sensitive personal data concerning roughly one million Maine voters – a request that far exceeds what would be necessary for legitimate evaluation of Maine's compliance with our obligations under law. Not only is Maine in full compliance with its obligations under the NVRA and HAVA to make reasonable efforts to maintain its voter lists, but through modernization efforts like automatic voter registration and online voter registration, we are leveraging technology to increase the quality of our list maintenance. Our local and state election officials work hard to preserve the integrity of our elections, and we are proud to be national leaders in voter participation. I ask that, in light of the information provided above, DOJ withdraw its unreasonable request for personal data on individual Maine voters.

Sincerely,

*Shenna Bellows*

Shenna Bellows
Secretary of State