## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>SHENNA BELLOWS, in her official capacity<br>as Secretary of the State of Maine, and<br>the State of Maine,<br><br>    Defendants. | Case No. 1:25-cv-00468-LEW |

## PLAINTIFF UNITED STATES' OPPOSITION TO MOTIONS FOR INTERVENTION AS DEFENDANTS AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff, United States of America ("United States"), opposes the Motion to Intervene as Defendants by John Schneck and Marpheen Chann, ECF No. 10, and the League of Women Voters, ECF No. 18 (collectively, "Proposed Intervenors"). Proposed Intervenors have failed to meet their burden of demonstrating that they meet the standard for intervention as of right under Federal Rule of Civil Procedure ("Rule") 24(a) or for permissive intervention under Rule 24(b). Accordingly, the United States respectfully requests that the Court deny the Proposed Intervenors' Motions to Intervene as Defendants.

## BACKGROUND

This is a straightforward case brought by the Attorney General of the United States to enforce the requirements of three complementary Federal statutes governing voter registration and voting records pertaining to Federal elections. The Civil Rights Act of 1960 ("CRA") requires state and local officials to retain and preserve records related to voter registration and

1

other acts requisite to voting for any Federal office for a period of twenty-two months after any Federal election and to produce those records to the Attorney General upon request. *See* 52 U.S.C. §§ 20701-20706.

The National Voter Registration Act of 1993 ("NVRA") mandates that responsible election officials "ensure that accurate and current voter registration rolls are maintained" for Federal elections. 52 U.S.C. § 20501(b)(4). To that end, Section 8 of the NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant" or "a change in the residence of the registrant . . .". 52 U.S.C. § 20507(a)(4). Section 8(i) of the NVRA provides that states shall make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with certain exceptions. 52 U.S.C. § 20507(i).

The purpose of the Help America Vote Act of 2002 ("HAVA") "is to improve our country's election system" by recognizing "the federal government can play a valuable [role] by assisting state and local government in modernizing their election systems." H.R. Rep. No. 107-329(I) at 31-32 (2001). HAVA imposes "minimum requirements" for the conduct of Federal elections. *Id.* at 35. Specifically, all states are required to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State. . .". 52 U.S.C. § 21083(a)(1)(A). Section 303 of HAVA provides that a state's "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated

regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters," among other requirements. 52 U.S.C. § 21083(a)(4).

The United States, acting through its Attorney General, routinely investigates state compliance with the list maintenance requirements for Federal elections. In both Democratic and Republican administrations, the Attorney General has pursued enforcement actions against state and local governments and their officials when their efforts to maintain accurate voter rolls for Federal elections have fallen short of HAVA and NVRA requirements.[1] Identification of noncompliant states is accomplished, in part, by reviewing the biennial Election Administration and Voting Survey ("EAVS") report prepared by the U.S. Election Assistance Commission ("EAC"), "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the voting process."[2] Maine, like other states, provided the EAC with voter registration and list maintenance-related data in response to the EAVS.

Maine's data and answers as reflected in the 2024 EAVS Report, published on June 30, 2025, indicated several potential issues that might be inconsistent with reasonable list maintenance efforts. Based on its review of the EAVS data, the Department of Justice (the "Department" or "DOJ") sent detailed inquiries regarding Maine's list maintenance procedures to the Maine Secretary of State in a letter dated July 24, 2025. Compl., ECF No. 1-1, pp. 2-3. The Department's August 18, 2025, letter also requested, pursuant to the NVRA, 52 U.S.C. § 20501, the current electronic copy of Maine's computerized, statewide voter registration list ("VRL"),

---

[1] A list of HAVA and NVRA enforcement actions brought by the U.S. Department of Justice's Voting Section is available at https://www.justice.gov/crt/voting-section-litigation.

[2] EAC website, "About the EAC," https://www.eac.gov/about.

required by HAVA, 52 U.S.C. § 21083. Compl., ECF No. 1-3.

As way of example, the Department's July 24, 2025, letter noted that there are nearly as many registered voters listed as active voters in the citizen-voting-age population in Maine, with a registration rate in 2024 of 92.4 percent of the citizen-voting-age population. Compl., ECF No. 1-1, p. 2, ¶ 1. To place that percentage in its proper context, the national average registration rate in was 86.6 percent of the citizen voting age population. 2024 EAVS Report at 160. Among the fifty states and the District of Columbia, just one state reported registration rates of their citizen-voting-age population at a higher rate than Maine. *See id.* at 156-60 (Alabama). As the Maryland Office of Legislative Audits concluded in a 2023 report of that state's high registration rates, the low removal rate suggests unreasonable list maintenance efforts.[3]

As another example, the Department's July 24, 2025, letter noted for Question A3d that Maine had 11,011 duplicate registrations, or just 3.5% of registered voters, almost four times fewer than the national average of 12.7%. *Id.* at ¶ 2. In the 2022 EAVS survey, Maine had just 3,638 duplicate registrations, or 2% of registered voters. 2022 EAVS Report at 178. Maine did not respond to Question A12h, regarding duplicate registrants who were removed from the statewide database, nor did Maine respond to Question 13a, regarding what records were merged or linked to another record. *Id.*

Likewise, Maine provided no information to Question A12e, as to persons who received a confirmation notice and then did not vote in two subsequent elections. *Id.* at ¶ 4. As for Question A12b, Maine reported that it had removed 101,711 voters (77.3%) for having moved

---

[3] *See* Maryland Gen. Assy., Dept. of Legislative Servs., Office of Legislative Audits, Audit Report: State Bd. of Elections 10-12 (Oct. 2023) (describing deficiencies in the state board's failure to identify and remove duplicate registrations and deceased voters), *available at* https://dls.maryland.gov/pubs/prod/NoPblTabPDF/SBE23.pdf.

outside the state, which was twice the national average. Maine provided no explanation as to its process for removing persons, who move out of state. *Id.* at ¶ 5.

Lastly, Maine had not explained its process for identifying and removing deceased persons from its VRL. *Id.* at ¶ 5.

Maine Secretary of State Bellows responded by U.S. mail and e-mail on August 8, 2025, to DOJ's letter. Compl., ECF No. 1-2. Secretary Bellows provided a list of election officials, as well as the process for identifying and removing deceased voters and checking for duplicate voter registrations in states participating in ERIC. *Id.* at p. 2-3, 6. Bellows was meaningfully unresponsive to the Department's request for information regarding Maine's registration rate and duplicate transactions. *Id.* at 4-5. Significantly, Maine still did not provide any information regarding how the State independently identifies ineligible voters by non-citizenship, and, most importantly, Maine still refuses to provide its statewide VRL. *Id.* at 3-4.

On August 18, 2025, the Department sent an updated letter to the Secretary of State of Maine, which provided clarifications regarding its previous request for information and records related to Maine's statewide voter list maintenance. Compl., ECF No. 1-3. The letter explained that the Department's request for Maine's VRL, including the registrant's full name, date of birth, residential address, state driver's license number, or the last four digits of the registrant's social security number ("SSN4"),was pursuant to its authority under the NVRA, HAVA, and CRA and the purpose of the request was to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA. *Id.*

On September 8, 2025, the Secretary of State refused to provide the requested information. Taken together, the data that Maine provided to the EAC and its incomplete,

nonresponsive answers to the Department raised several issues that necessitated further action.

On September 16, 2025, the United States brought this action in response to Defendants' violations of Federal law. Compl., ECF No. 1.  On September 18, 2025, the United States filed a motion to show cause why Defendants have failed to produce the demanded records. ECF No. 5. On September 23, 2025, John Schneck and Marpheen Chan filed their motion to intervene as defendants. ECF No. 10.  On September 29, 2025, the League of Women Voters filed their motion to intervene as defendants. ECF No. 18.

Proposed Intervenors have failed to establish sufficient grounds for intervention, lack standing under controlling authority, and have not made the necessary "very compelling" showing of inadequate representation by governmental Defendants. Proposed Intervenors present only a generalized interest in preventing the United States from obtaining relief from Defendants' violations of Federal law. And Proposed Intervenors offer only a speculative basis for intervention that fails to articulate any concrete grievance or interest that has been or may be violated. Proposed Intervenors have failed to meet their burden of demonstrating that they meet the standard for intervention of right, as set forth in Rule 24(a), or for permissive intervention, as set forth in Rule 24(b). For the reasons specified below, the Proposed Intervenors' motion should be denied.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 24 provides the standards for intervention of right and permissive intervention. Intervention of right is appropriate, if the proposed intervenor: (1) files in a timely manner; (2) demonstrates an interest in the action; (3) shows that the interest may be impaired by the disposition of the action; and (4) has an interest not otherwise adequately protected. Fed. R. Civ. P. 24(a)(2); *see also Berger v. N. Carolina State Conf. of NAACP*, 597 U.S. 179, 190 (2022) (same); *Caterino v. Barry*, 922 F.2d 37, 39 (1st Cir. 1990) (same). Proposed

intervenors bear the burden of demonstrating they have a right to intervene. *Caterino*, 922 F.2d at 39. Failure to meet any one of these requirements requires denial of the motion. *Id*. at 40. Where a proposed intervenor fails to meet one of the requirements, the court need "not address any of the other requirements of Rule 24(a)(2)." *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).

Permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(2) may be appropriate, if the proposed intervenor shows: "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *In re Thompson*, 965 F.2d 1136, 1142 n. 10 (1st Cir. 1992); *N. Am. Specialty Ins. Co. v. Seacoast Crane Co., Inc.*, 226 F.R.D. 27, 30 (D. Me. 2005). The rule vests the district court with "broad" discretion to consider whether permissive intervention will delay the lawsuit or prejudice the adjudication of the rights of the original parties. *N. Am. Specialty*, 226 F.R.D. at 30 (quoting *Daggett v. Comm'n on Governmental Ethics & Election Pracs.*, 172 F.3d 104, 113 (1st Cir.1999)). Importantly, the rule "also *requires* that the court 'consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Perry*, 587 F.3d at 955 (quoting Fed. R. Civ. P. 24(b)(3)) (emphasis in original). "Even if an applicant satisfies those threshold requirements, the district court has discretion to deny permissive intervention." *Donnelly v. Glickman,* 159 F.3d 405, 412 (9th Cir. 1998).

## **ARGUMENT**

## I.    **THE PROPOSED INTERVENORS DO NOT MEET THE STANDARD FOR INTERVENTION AS OF RIGHT.**

### A.    **The Proposed Intervenors Have No Interest in This Action.**

To support intervention, the intervenor's interest must be a particularized and legally protected interest rather than a general grievance. *See* Fed. R. Civ. P. 24(a)(2). That necessitates

"a significantly protectable interest," *Donaldson v. United States*, 400 U.S. 517, 531 (1971), requiring that the intervenor establish the legal right to bring or defend the claim before the district court as a plaintiff or defendant. *See generally Diamond v. Charles*, 476 U.S. 54, 66–67 (1986) ("Article III requires more than a desire to vindicate value interests. It requires an 'injury in fact' that distinguishes "'a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.'"). Intervenors must show they "stand to gain or lose by the direct legal operation of the district court's judgment" on the complaint. *Teague v. Bakker*, 931 F.2d 259, 261 (4th Cir. 1991); *see Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977) (standing as factor for permissive intervention). "An 'interest' shared by all members of an electorate is not 'sufficient[ly particularized] to meet the requirements of Rule 24(a).'" *Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, No. 5:24-cv-00547-M, 2024 WL 4349904, at *2 (E.D.N.C. Sept. 30, 2024) (denying motion to intervene by the North Carolina Conference of the NAACP) (quoting *League of Women Voters of Va. v. Virginia State Bd. of Elections*, 458 F. Supp. 3d 460, 466 (W.D. Va. 2020)). Proposed Intervenors cannot meet their burden for three reasons: (1) neither HAVA nor the CRA confers a right for private organizations or individuals to be party plaintiffs or defendants in this action; (2) Federal law expressly refutes their speculative concern that the privacy of voter information will not be protected; and (3) they have failed to identify any particularized harm that differs from that of any other member of the public. *Id.*

    1.   <u>HAVA and the CRA Confer No Private Right of Action and Limit Defendants to Responsible Government Officials.</u>

Proposed Intervenors can neither bring, nor defend a claim under HAVA or the CRA because neither HAVA, nor the CRA creates a private right of action. Turning first to HAVA, the

only enforcement provision in the statute authorizing a cause of action in Federal court is found at

Section 401, which provides that:

> The *Attorney General* may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 21081, 21082, 21083, and 21083a of this title [Sections 301, 302, 303, and 303a of HAVA].

52 U.S.C. § 21111 (emphasis added).

Aside from that right of action, granted exclusively to the Attorney General of the United

States, no other explicit right of action in Federal court exists to enforce the provisions of HAVA.

The clear text of the statute is reinforced by its legislative history. Senator Dodd of Connecticut –

a HAVA conferee and sponsor – openly lamented the lack of a private right of action in HAVA,

observing that such participation was limited to the participation through the Act's administrative

hearing process in Section 402 of the Act, 52 U.S.C. § 21112:

> While I would have preferred that we extend the private right of action afforded private parties under [the] NVRA, the House simply would not entertain such an enforcement provision[]. Nor would they accept Federal judicial review of any adverse decision by a State administrative body. However, the state-based administrative procedure must meet basic due process requirements and afford an aggrieved party a hearing on the record if they so choose.

148 Cong. Rec. S10512 (daily ed. Oct. 16, 2002).

Consequently, private parties may not bring Section 303 claims nor make requests for

records under that provision. *See Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (per

curiam) ("Respondents, however, are not sufficiently likely to prevail on the question whether

Congress has authorized the District Court to enforce § 303 in an action brought by a private

litigant to justify the issuance of a TRO."); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 286

(2002) (explaining that where "the text and structure of a statute … provide no indication that

9

Congress intends to create new individual rights, there is no basis for a private suit.").

HAVA's text, likewise, limits who may be a defendant. As HAVA's preamble makes clear, the provisions of Title III of the Act "establish minimum election administration standards for States and units of local government … responsibl[e] for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666. Proper party defendants in a Section 303 enforcement action therefore are limited to "any State or jurisdiction." 52 U.S.C. § 21111. Under Section 303(a), "State or jurisdiction" includes their election officials who are responsible for implementing the statutory mandates. *See*, *e.g.*, 52 U.S.C. § 21083(a)(1)(A) (*"[E]ach State, acting through the chief State election official*, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list…".) (emphasis added); 52 U.S.C. § 21083(a)(1)(A)(vi) ("All voter registration information obtained by *any local election official in the State* shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official…".) (emphasis added); 52 U.S.C. § 21083(a)(5)(A)(i) ("an application for voter registration for an election for Federal office may not be accepted or processed by a *State* unless the application includes" the identifying number required by Section 303) (emphasis added); 52 U.S.C. § 21083(a)(5)(A)(ii) ("… *the State* shall assign the applicant a number which will serve to identify the applicant for voter registration purposes…") (emphasis added); 52 U.S.C. § 21083(a)(5)(A)(iii) ("*The State* shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.") (emphasis added). To summarize, Section 303 of HAVA regulates election administrators responsible for timely updating Maine's computerized SVRL for Federal offices; the State and those officials are the only valid defendants.

The CRA has limitations on parties that parallel those included in HAVA. Title III of the

CRA provides that only the Attorney General of the United States may bring an action in Federal court to enforce the Act's provisions for retaining and producing election records upon request. *See* 52 U.S.C. § 20703 (providing that "upon demand in writing by the *Attorney General*" "[a]ny record or paper required by section 301" shall be "made available for inspection, reproduction, and copying…") (emphasis added); *see also* 52 U.S.C. § 20705 (providing that the United States District Court for the district in which the Attorney General has made the demand "shall have jurisdiction" over any litigation to compel production of the covered records).

Like HAVA, the CRA limits defendants to certain election officials. Section 301 of the CRA applies to "*[e]very officer of election*" who must "maintain and preserve, for a period of twenty-two months from the date of any general, special, or primary election" for Federal office "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…" 52 U.S.C. § 20701 (emphasis added). Section 306 of the CRA makes this explicit, defining the term "officer of election" as "any person who, under color of any Federal, State, Commonwealth, or local law, statute, ordinance, regulation, authority, custom, or usage, performs or is authorized to perform any function, duty, or task in connection with any application, registration, payment of poll tax, or other act requisite to voting" in any Federal election. 52 U.S.C. § 20706.

Proposed Intervenors do not contend, and cannot establish, that they have any responsibilities for voter-list maintenance under Section 303 of HAVA, nor that they are required to maintain and produce voter registration records under Sections 301 or 306 of the CRA. Rather, Proposed Intervenors allege they "fear[] the disclosure of their sensitive personal information to the federal government.". . . ECF No. 10 at 7.  This conclusory statement is not supported by any factual basis whatsoever as to what interest would be harmed by disclosure.  Intervenor Schneck

fears disclosure "will deter Mainers from registering to vote and undermine Maine's high levels of voter participation." *Id*. at 7-8. Intervenor Chann postulates—without a scintilla of factual support—that disclosure "will discourage political participation by newly naturalized citizens, who justifiably fear the government.". . . *Id*. at 10.

Associational Intervenor, League of Women Voters of Maine ("LWVM"), alleges that DOJ reportedly plans to share the data it collects with Homeland Security Investigations to facilitate criminal and immigration investigations, citing to a *New York Times* post from September 9, 2025.  ECR No. 18 at 4.  LWVM further speculates that "voters will suffer the disclosure of their personal information to the federal government for murky reasons that could extend beyond USDOJ's legal authority." *Id*. at 7. LWVM goes on to theorize without evidence that disclosure of Maine's SVRL will cause Mainers to be "less likely to register to vote," . . . and "the data may be used to intimidate voters and suppress civil participation." *Id*.

The Attorney General seeks to enforce this action, and as addressed below, the Department is required to comply with the Privacy Act and has practices and procedures to ensure compliance. "In the absence of strong indicia of a contrary congressional intent," the Supreme Court has stated, "we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981). "Where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19 (1979). Congress specifically limited the parties in litigation over HAVA's computerized SVRL requirements and over voter registration records covered by Title III of the CRA to the Attorney General of the United States to enforce the provisions, and States, jurisdictions, and their responsible election officials, as defendants. Consequently, Proposed Intervenors are foreclosed

from intervening as a party, including in the role of a defendant.

Although case law interpreting the CRA is scarce, several decisions under HAVA reject intervention by individuals or groups not included in the statutory text. Federal courts have not permitted intervention by private parties and even for some election boards in previous Section 303 enforcement actions brought by the Attorney General. In *United States v. Alabama*, the Chairs of the Alabama Democratic Executive Committee and the Alabama Democratic Conference moved to intervene for the purpose of suggesting special masters to remedy the Section 303 violation. No. 2:06-CV-392-WKW, 2006 WL 2290726, at *1 (M.D. Ala. Aug. 8, 2006). The court denied their motions, concluding that "HAVA does not confer a private right of action. Congress granted explicitly to the Attorney General of the United States the right of enforcement of Sections 301, 302, and 303 of HAVA." *Id.* at *4. Therefore, the court found that the proposed intervenors did not have a "legally protectable" interest under HAVA and denied their motion. *Id*. Similarly, in *United States v. New York State Board of Elections*, the district court denied motions to intervene as defendants by the Nassau County Board of Elections and the Nassau County Legislature, despite both having some responsibilities under HAVA for administering the State's computerized SVRL. *See* 312 F. App'x 353 (2d Cir. 2008).

Here, individual Maine voters, who seek to intervene, bear no responsibility for implementing the requirements of HAVA, nor the CRA. Thus, neither of the Proposed Intervenors fall within the plain language of HAVA or the CRA, in which Congress clearly articulated who may be parties to enforcement actions, whether as plaintiffs or as defendants. As such, Proposed Intervenors have no legally protectable interest and are not entitled to intervene as of right.

2.  Voter Information Is Not at Risk of Improper Disclosure in This Action.

Even if this Court were to consider Proposed Intervenors' speculative concerns about the

privacy of data that voters have already voluntarily submitted to state election officials, those concerns are unfounded. The United States' requests in this matter are authorized by Congress. The Complaint states clearly that the United States is seeking relief in this litigation that is narrowly focused on obtaining records pursuant to the NVRA, HAVA, and the CRA to ensure Defendants' compliance with the list maintenance requirements of the NVRA and HAVA for Federal elections. Specifically, the United States' Complaint requests, *inter alia*, that the Court order Defendants "to provide to the United States the current electronic copy of Maine's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, or the last four digits of their Social Security number as required by 52 U.S.C. § 20703 ...". Compl., ECF No. 1 at 18. The requested relief encompasses the requirements pursuant to each relevant statute, and goes no further, to ensure and enforce compliance.

Proposed Intervenors' alleged injury—centering on speculative concerns that their sensitive, personal information and that of other Maine voters may be improperly disclosed to or used by the Department and disclosure may chill engagement by immigrant communities, ECF No. 5—is not concrete nor imminent, but hypothetical and lacking foundation. The information at issue is already subject to extensive statutory protections under Federal law, including the provisions of 5 U.S.C. § 552a, and the Department's practices and procedures to ensure compliance with the Privacy Act. *See* Compl., ECF No. 1-1 and 1-3. The litigation concerns whether certain information must be disclosed to the Attorney General to facilitate enforcement of list maintenance requirements under Federal laws, as Congress intended, not whether that information will be made public, nor whether any party to this case intends to misuse such data.

Similar alarmist arguments about the Attorney General's enforcement of Section 303 of

HAVA in North Carolina were made in *United States v. N. Carolina Bd. of Elections*, No. 5:25-cv-00283-M-RJ, at 12 (E.D.N.C. Sept. 8, 2025). There, the Federal court denied the motions to intervene when those arguments objectively proved to be unfounded.[4] The parties entered into a consent order that made clear: "All records and data received by the United States from the State Board Defendants will be kept securely and treated consistently with the Privacy Act, 5 U.S.C. § 552a. To the extent confidential records or data is requested, the State Board Defendants reserve the right to seek a protective order from the court." *See* Ex. 1. Therefore, in that case, as in this one, the United States has made clear it will protect voter information provided by the state consistent with the requirements of the Privacy Act, the CRA, and other applicable Federal law. The remedial order the United States requests can readily provide for those protections, just as the consent order did in the North Carolina litigation. As a result, like in North Carolina, the alarmist harms that the Proposed Intervenors decry cannot and will not materialize.

Moreover, speculative injury "does not rise to the level required for intervention as a matter of right." *Media Gen. Cable of Fairfax, Inc. v. Sequoyah Condo. Council of Co-Owners*, 721 F. Supp. 775, 779 (E.D. Va. 1989); *see also Laube v. Campbell*, 215 F.R.D. 655, 657 (M.D. Ala. 2003) ("Interests that are contingent upon some future events and which are 'purely a matter of speculation' are not 'the kind of protectable interest … necessary to support intervention as of right.'") (quoting *ManaSota–88, Inc. v. Tidwell*, 896 F.2d 1318, 1322 (11th Cir. 1990)). Even if Proposed Intervenors had a legally protectable interest in this case under the CRA, HAVA, or the NVRA—which they do not—their concern about an alleged improper disclosure, maintenance, or use of voter information is imagined, speculative, and not going to occur, because it is contrary to

---

[4] Two of the groups of proposed intervenors in that case have filed motions for reconsideration, which were pending when the case was stayed due to the Federal government shutdown.

Federal law and can be readily addressed by the Court through an order like the one entered in the North Carolina consent order.

    3   <u>Proposed Intervenors' Failure to Show a Particularized Harm in Protecting Their Information and Privacy.</u>

    Proposed Intervenors' arguments are speculative and inconsistent with the conduct that the individual Proposed Intervenors themselves have engaged in repeatedly and voluntarily providing the requested data to governmental entities. Federal agencies routinely are provided and maintain the same data being sought in this action. Individuals regularly share sensitive personal information—such as Social Security numbers, dates of birth, income, education, immigration status, and addresses—with Federal agencies like the IRS (for tax filing and refunds), SSA (for Social Security benefits), HHS (for Medicaid and Medicare), Department of Education (for Federal student aid), State Department (for passports), Selective Service (for draft registration), and the Census Bureau (for Federally mandated surveys used for representation and funding allocation). They do so without filing litigation to stop other agencies from performing similar congressionally mandated functions, such as the voter list maintenance enforcement powers assigned to the Attorney General.  Moreover, the United States is not seeking, and will not be seeking, any information from a single Proposed Intervenor, nor will it be seeking more information than Proposed Intervenors have already voluntarily submitted to the State of Maine to be eligible to participate in Federal elections. Nor will the Attorney General be seeking more information than has already been provided by the State to a non-governmental organization (ERIC), for which the United States is aware of no objection from any of these Proposed Intervenors to disclose the same personal identifying information to other government agencies, state and federal. Consequently, none of the Proposed Intervenors or their members can be harmed by the outcome of this litigation. Without an interest, Proposed Intervenors' claims of impairment

of that interest must fail.

Furthermore, district courts routinely deny motions to intervene, even in cases unlike this one where the individual right to vote is implicated. "[C]ourts that have addressed intervention motions from similarly situated prospective intervenors… have regularly denied intervention as of right under Rule 24(a)." *League of Women Voters*, 458 F. Supp. 3d 460, 465 (W.D. Va. 2020) (collecting citations). Here, "[t]here is nothing that distinguishes the Prospective Intervenors' interest in this case from that of any other eligible voter" in Maine. *Id*. Proposed Intervenors have interests that are indistinguishable from all other Maine citizens of voting age.

"Courts are typically disinclined to allow intervenors who merely assert a 'generalized public policy interest shared by a substantial portion of the population.'" *Id.* "[D]espite its 'personal' nature, the right to vote… is no different as between any other eligible [Mainer], and indeed, any other eligible American. It may be personal, but it is also *universal* to those that qualify for the franchise." *Id*. (emphasis in original). Unlike cases directly implicating the right to vote, Proposed Intervenors have no interest in this case, which involves regulation of the administration of Federal elections in Maine and the associated records that Federal law mandates must be produced to the Attorney General of the United States.

### B. Proposed Intervenors Cannot Show an Interest That May Be Impaired by the Disposition of this Action.

Next, Proposed Intervenors are required to establish that their purported interest may be impaired by the disposition of the action. *See* Fed. R. Civ. P. 24(a)(2); *Wilderness Soc'y*, 630 F.3d at 1177. In this factor, "'[t]he focus ... is on whether the proposed intervenor would suffer a 'practical disadvantage or impediment' if not permitted to intervene.'" *Republican Nat'l Comm*., 2024 WL 4349904, at *2. "This requirement is 'intimately related' to the alleged interest sought to be protected" by the Proposed Intervenors. *United States v. Alabama*, 2006 WL 2290726, at *5

(quoting *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989)); *see also Republican Nat'l Comm.*, 2024 WL 4349904, at *2 ("If a third party satisfies the first factor of Rule 24(a), it often follows that participation as a party is necessary to protect that interest.") (citation omitted). Proposed Intervenors cannot make their required showing.

Proposed Intervenors have failed to show an interest distinguishable from that of all other Mainers. This is a dispute between the Attorney General of the United States, who requested voter registration records, and the State of Maine that maintains those records. The United States is not seeking and will not be seeking any information from any individual Maine voter, nor will it be seeking more information than Maine voters have already voluntarily submitted to the State of Maine to be eligible to participate in Federal elections. Consequently, none of the Proposed Intervenors can suffer harm from the outcome of this litigation. Thus, there is no interest that Proposed Intervenors can protect in this litigation from harm other than the generalized interest of all Mainers, and indeed of all Americans, in the fair and equitable administration of elections. Without a particularized interest, Proposed Intervenors' claims fail.

## C.    Proposed Intervenors Cannot Show Inadequate Representation by the State Government Defendants.

"There is … an assumption of adequacy when the government is acting on behalf of a constituency that it represents. In the absence of a *very compelling showing* to the contrary, it will be presumed that a state adequately represents its citizens when the applicant shares the same interest." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (emphasis added). Federal courts have long followed the rule that "when a governmental body or officer is the named party," … "representation will be presumed adequate unless special circumstances are shown." 7C Wright, Miller & Kane, Federal Practice and Procedure § 1909 (3d ed. Supp. 2022); *see also Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020) (applying a

presumption of adequate representation of intervenors' interests by the governmental party); *Prete v. Bradbury*, 438 F.3d 949, 957 (9th Cir. 2006) (same).

The United States Supreme Court narrowed that rule slightly by holding that the presumption of adequate representation is inapplicable where the proposed intervenors themselves are government officials, namely "duly authorized state agent[s]." *Berger*, 597 U.S. at 197. Since none of the Proposed Intervenors is a "duly authorized state agent," the presumption that State Defendants will adequately represent their interests applies. The First Circuit has determined that where the party seeking to intervene has the same ultimate goal as a party already in the suit, courts are to apply a presumption of adequate representation. *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979). To overcome that presumption, the intervenor must ordinarily demonstrate adversity of interest, collusion, or nonfeasance. *Id.* (citing *Commonwealth of Virginia v. Westinghouse Electric Corp.*, 542 F.2d 214, 216 (4th Cir. 1976)).

Here, the record demonstrates that the Proposed Intervenors share the same interests in this litigation—to reject efforts by the United States to obtain Maine's SVRL pursuant to its Federal claims, because both Intervenors and the State allege concerns about voter privacy and how the requested data will be used. Since the Intervenors and the State share the same interests in this matter and Intervenors have not demonstrated adversity of interest, collusion, or nonfeasance, Intervenors' interests are adequately represented by the State. *Moosehead*, 610 F.2d at 54. Proposed Intervenors have failed to demonstrate a right to intervene under Rule 24(a)(2).

## II.    <u>PROPOSED INTERVENORS DO NOT MEET THE STANDARD FOR PERMISSIVE INTERVENTION.</u>

Rule 24(b)(2) intervention should be denied for the same reasons. As explained above, Proposed Intervenors' interests and objectives align with those of the State Defendants and their participation will not significantly contribute to full development of the factual and legal issues in

this action. *Id*. Permissive intervention requires more than just a timely motion and raising a "claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). The Rule "also *requires* that the court 'consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Perry*, 587 F.3d at 955 (quoting Fed. R. Civ. P. 24(b)(3)). Adding intervenors would impede, not advance, this litigation. The Proposed Intervenors have no standing to assert any claim or defense in this litigation and, therefore, could add nothing to the Court's consideration of the United States' claims and merely delay resolution.

Denying permissive intervention will not leave the Proposed Intervenors without recourse. Nothing would impede their ability to consult with their duly elected State officials, particularly Secretary Bellows, about how to proceed. They also would "retain the ability to present their views… by seeking leave to file" an amicus brief. *Stuart v. Huff*, 706 F.3d 345, 355 (4th Cir. 2013). "While a would-be intervenor may prefer party status to that of friend-of-the-court, the fact remains that amici often make useful contributions to litigation. The availability of such alternative avenues of expression reinforces … [the] disinclination to drive district courts into multi-cornered lawsuits by indiscriminately granting would-be intervenors party status and all the privileges pertaining thereto." *Id*.

Accordingly, the Court should deny permissive intervention to Proposed Intervenors.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests the Court deny the Motions to Intervene as Defendants.

Dated: November 25, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

*David D. Vandenberg*
MAUREEN S. RIORDAN
Senior Counsel, Voting Section
Civil Rights Division
TIMOTHY F. MELLETT
DAVID D. VANDENBERG
Attorneys, Voting Section
Civil Rights Division
950 Pennsylvania Avenue 4CON
Washington, DC 20530
Maureen.Riordan2@usdoj.gov
Timothy.F.Mellett@usdoj.gov
David.Vandenberg@usdoj.gov
Tel. (202) 307-2767
*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ David D. Vandenberg
David D. Vandenberg