UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>SHENNA BELLOWS in her official capacity as Secretary of the State of Maine and the STATE OF MAINE,<br><br>    Defendants. | Docket No. 1:25-cv-00468 |

**MAINE'S MOTION TO DISMISS**
**Fed. R. Civ. P. 12(b)(6)**

Defendants State of Maine and Secretary of State Shenna Bellows (together, "Maine") move to dismiss Plaintiff United States of America's ("DOJ's") complaint (ECF No. 1) for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

**Preliminary Statement**

Federal law charges States with conducting a "general program" that makes a "reasonable effort" to remove from their centralized voter registration systems voters who die or change their residence. 52 U.S.C.A. § 20507(a)(4). This requirement is modest; the program suffices as long as it is "a serious attempt that is rational and sensible." *Pub. Int. Legal Found., Inc. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025). In deference to States' constitutional role as the primary administrators of federal elections, *see* U.S. Const. art. I, § 4, Congress expressly left "the specific choices on the methods of complying" up to each State, 52 U.S.C.A. § 21085.

This action reflects an attempt by the Department of Justice ("DOJ") to stretch its enforcement authority over these modest list-maintenance provisions well past its breaking point. In the guise of enforcing these requirements, DOJ has demanded that States across the country

hand over their complete, unredacted voter registration databases.  Not only do these databases contain a trove of sensitive personally identifiable information (PII) like drivers' license numbers and social security numbers, they also contain data about voters' First Amendment–protected activities such as their choice of political party and in which elections they chose to vote.  As to Maine, DOJ demanded that the State hand over this sensitive data without even describing— despite repeated queries by the Secretary of State—a factual basis for its demand or how it planned to store, use, or disseminate the data.  No responsible Secretary of State, charged under state and federal law with protecting the confidentiality of voters' PII, would have acquiesced to such an audacious and inscrutable demand.

DOJ now asks this Court to compel Maine to turn over Maine's entire voter database to the federal government so it can be used for purposes that DOJ *still* has not fully explained.  But DOJ's three legal theories for compelling such production each fail as a matter of law.  Under binding First Circuit precedent, the National Voter Registration Act's (NVRA's) public inspection provision does not apply to the sort of highly sensitive PII that DOJ seeks here.  The Help America Vote Act (HAVA) does not contain any sort of subpoena power or other provision authorizing DOJ to demand records from States, let alone sensitive voter PII.  And while Title III of the Civil Rights Act of 1960 contains a provision allowing the Attorney General to seek some voter registration records from states, it requires DOJ to state both "the basis" and "the purpose" for its demand.  DOJ's demand stated only a purpose, making its demand facially deficient.  What is more, even the purpose cited by DOJ—enforcement of list-maintenance requirements— is not a valid purpose under the CRA, which is limited to authorizing document requests in support of investigations of racial discrimination in voting.

Were this not enough (and it is), DOJ's demand also blatantly violates the federal Privacy

Act of 1974, the post-Watergate law enacted to prevent precisely the sort of secret compilation of data on Americans' First Amendment activities that DOJ appears to be attempting here.  Under the Privacy Act, a federal agency may not collect data on Americans' exercise of their First Amendment rights, subject only to narrow exceptions that DOJ does not meet here.  Nor has DOJ provided the notice to the public and to Congress required before it may undertake such a vast expansion of its collection of data on individual Americans who have done nothing wrong.

The Court should dismiss DOJ's complaint in its entirety.

### Alleged Facts

*Maine's Central Voter Registration System*

Since 2007, Maine has maintained an electronic database of all Maine registered voters as part of a software application called the central voter registration system (CVR).  *See* P.L. 2005, ch. 453, § 40.  Data fields contained in CVR include, among other things, every registered voter's name, residence address, mailing address, party affiliation, date of birth, date of registration, and history of all elections in which the voter has participated ("voter participation history").  *See* 21-A M.R.S.A. §152(1)–(2) (listing contents of the voter registration application and requiring all responses to be entered into CVR); *id*. § 721 (requiring registrars to enter voter participation history in CVR after each election).  CVR also contains the number the voter provided on their voter registration application to verify their identity, which can be that voter's Maine driver's license number, nondriver identification card number, or the last four digits of their social security number.  *See* 21-A M.R.S.A. § 152(1)(M).

Since CVR's inception, the Maine Legislature has charged the Secretary with protecting the PII contained within it from unwarranted disclosure.  *See* P.L. 2005, ch. 404 (codified at 21-A M.R.S. § 196, recodified as amended at 21-A M.R.S. § 196-A).  Maine law designates

CVR data as confidential and exempts it from Maine's public records law. 21-A M.R.S. § 196-A(1); 1 M.R.S.A. § 402(3)(A). While an exception to that confidentiality law gives the Secretary discretion to provide certain CVR data to government entities upon request, that authority does not extend to bulk disclosure of sensitive PII like full date of birth, social security number, and driver's license number. *Id*. § 196-A(1)(E). Maine law designates such PII contained in the CVR, along with other categories of data, as "highly sensitive personal information" that cannot be disclosed even to authorized requestors. *Id.* § 196-A(1)(K)(2). Maine law also forbids the Secretary from disclosing voters' party affiliation and voter participation history to other governmental entities. *See id.* § 196-A(1)(E).

*Federal and State Voter List Maintenance Requirements*

Two federal laws, the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA), require states to conduct programs to maintain the accuracy and currency of their voter lists. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence. 52 U.S.C.A. § 20507(a)(4). Subject to certain restrictions designed to protect voters from being wrongfully purged from voting lists, the NVRA leaves it to the States to design and operate its list-maintenance program as it sees fit.

HAVA introduced various election reforms in the wake of the 2000 presidential election, including a requirement that States maintain centralized voter registration databases. *Id.* § 21083(a)(1)(A). As part of this requirement, states must adopt "a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A). Importantly, while HAVA clarified that the NVRA's list maintenance requirements apply to the new voter registration databases, "[n]othing

in HAVA broaden[ed] the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). HAVA also, consistent with the NVRA, expressly provides that "specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." 52 U.S.C.A. § 21085.

Like federal law, Maine law specifically provides for maintenance of the list of voters contained in CVR. It authorizes the Secretary to conduct statewide maintenance of CVR and requires her to adopt rules for conducting NVRA-compliant voter list maintenance. 21-A M.R.S.A. § 161(2-A). It likewise permits the Secretary to share CVR data with a consortium of other states for the purpose of list maintenance. *Id.* § 161(2-B). Under this authority, Maine has become a member of the Electronic Registration Information Center (ERIC) and engages in list maintenance based on ERIC's analysis of the data Maine submits. Compl. ¶ 54. Importantly, as DOJ concedes, data shared to ERIC is encrypted via "a cryptographic one-way hash," *id.*, meaning ERIC receives only encrypted codes ("hashes") representing voter data, which ERIC can compare with hashes from other sources for matching purposes but cannot itself decrypt.

*The Department of Justice's Demand for Unredacted Voter Data*

In March 2025, President Trump issued an Executive Order ("EO") titled "Preserving and Protecting the Integrity of American Elections." *See* Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025). In addition to purporting to require users of the federally issued voter registration application to submit documentary proof of citizenship—a requirement that has since been enjoined by multiple federal courts,[1]—the EO ordered the federal government to acquire and analyze state voter-list data. Specifically, the EO directed that

---

[1]   *See California v. Trump*, 786 F. Supp. 3d 359, 396-97 (D. Mass. 2025) (preliminary injunction); *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025) (permanent injunction).

> the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

*Id.* at § 2(b)(iii).

On July 24, 2025, Maine received a letter from DOJ demanding, without any explanation or justification, Maine's entire "computerized statewide voter registration list," including "all fields contained within the list." Compl. Ex. 1, at 1. DOJ cited the NVRA's public disclosure provision, 52 U.S.C.A. § 20507(i), as the sole basis for its demand. *Id.* DOJ's letter also asked a series of questions concerning Maine's list maintenance program under the NVRA and Maine's responses to the Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS). *Id.* at 2–3.

The Secretary responded to DOJ's letter on August 8, 2025. The Secretary provided a detailed explanation of Maine's list-maintenance program, explaining, among other things, that Maine recently cancelled nearly 200,000 registrations following an NVRA-compliant address-confirmation mailing, and that Maine routinely uses data from the State's Bureau of Vital Records and from the Social Security Administration's Limited Access Death Mater File to review CVR for deceased voters. *See* Compl., Ex. 2, at 1–3. The Secretary also responded to each of DOJ's questions concerning EAVS data, explaining why the data cited by DOJ were not evidence of list-maintenance issues. *Id.* at 4–6. Responding to the request for Maine's full unredacted voter list under the NVRA, the Secretary asked DOJ several questions about how it planned to use and protect the data and whether its request was consistent with federal privacy laws. *Id.* at 3-4.

DOJ, in turn, issued another letter on August 18, 2025, though it did not respond to most

of the Secretary's inquiries.  DOJ reasserted its request for the full unredacted voter file containing "all fields," including "date of birth," "state driver's license number," or "the last four digits of the registrant's social security number."  Compl., Ex. 3, at 1.  For the first time, however, it contended that its request was made under HAVA and Title III of the Civil Rights Act (CRA), in addition to the NVRA.  *Id.* at 2.  In response to the Secretary's concern that the data request might be inconsistent with federal privacy laws, DOJ stated that "[a]ll data received from you will be kept securely and treated consistently with the Privacy Act."  *Id.* at 3.  Notably, after referencing the CRA's requirement that DOJ provide states with the "the basis and the purpose" for any document requests, the letter stated "[t]he purpose of the request is to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA," but it did not identify any basis for the request.  *Id.* at 2.

The Secretary responded to DOJ's second letter on September 8, 2025, expressing continued concern that the request exceeded DOJ's authority and violated federal privacy laws.  *See* Exhibit A.[2]  The Secretary invited DOJ to provide additional information addressing her concerns.  *Id.* at 3.  DOJ did not respond and instead filed the present action.

*DOJ's Lawsuits Against Other States*

Maine is just one of many states subject to demands from DOJ for voter data.  So far, DOJ has demanded voter files from at least 30 other states.  *See* Exhibit B (collecting DOJ letters to states).  Moreover, DOJ has filed suits against 17 other states seeking the same voter data that

---

[2]  Though the DOJ omitted this letter from the Complaint's attachments, the Court may consider the existence of official government correspondence on a motion to dismiss.  *See Torréns v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

it seeks from Maine.[3]  DOJ's demand of Maine is thus part of a coordinated effort by DOJ to obtain full voter registration lists from numerous other states, if not all of them.

*Allegations in DOJ's Complaint*

DOJ's complaint contains several notable allegations and omissions.  *First*, the Complaint admits that DOJ demanded Maine's unredacted voter file simultaneously with its initial requests for information, and thus before it received and reviewed the Secretary's explanation of Maine's list-maintenance program and her response to DOJ's questions about Maine's report to EAVS.  Compl. ¶ 31.  *Second*, the Complaint confirms that DOJ has not concluded that Maine is violating HAVA or the NVRA, alleging only that the Secretary's initial response to DOJ's questions "did not provide sufficient details" to assess compliance.  *Id.* ¶ 37. The Complaint does not allege that DOJ attempted any follow-up to obtain additional or more detailed information, and while it summarizes the Secretary's answers to DOJ's various questions, the Complaint offers little explanation as to why they were insufficient.  Compl. ¶¶ 38–46.  *Third*, the Complaint acknowledges that DOJ's collection of voter data is subject to the federal Privacy Act and incorporates by reference a Systems of Record Notice that it alleges to set forth the intended uses of the voter file.  Compl. ¶ 53.

---

[3]  *See United States v. Oregon*, 6:25-cv-01666 (D. Or.) (filed Sept. 16, 2025); *United States v. Simon*, 0:25-cv-03761 (D. Minn.) (filed Sep. 25, 2025); *United States v. Benson*, 1:25-cv-01148 (W.D. Mich.) (filed Sept. 25, 2025); *United States v. Pennsylvania*, 2:25-cv-01481 (W.D. Penn.) (filed Sept. 25, 2025); *United States v. Bd. Of Elecs.*, 1:25-cv-01338 (N.D.N.Y.) (filed Sep. 25, 2025); *United States v. Scanlan*, 1:25-cv-00371 (D.N.H.) (filed Sept. 25, 2025); *United States v. Weber*, 2:25-cv-09149 (C.D. Cal.) (filed Sept. 25, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del.) (filed Dec. 2, 2025); *United States v. Demarinis*, 1:25-cv-03934 (D. Md.) (filed Dec. 2, 2025); *United States v. Oliver*, 1:25-cv-01193 (D.N.M.) (filed Dec. 2, 2025); *United States v. Amore*, 1:25-cv-00639 (D.R.I.) (filed Dec. 2, 2025); *United States v. Hanzas*, 2:25-cv-00903 (D. Vt.) (filed Dec. 2, 2025); *United States v. Hobbs*, 3:25-cv-06078 (W.D. Wash.) (filed Dec. 2, 2025); *United States v. Galvin*, 1:25-cv-13816 (D. Mass.) (filed Dec. 11, 2025); *United States v. Nago*, 1:25-cv-00522 (D. Haw.) (filed Dec. 11, 2025); *United States v. Griswold*, 1:25-cv-03967 (D. Colo.) (filed Dec. 11, 2025); *United States v. Aguilar*, 3:25-cv-00728 (D. Nev.) (filed Dec. 11, 2025).

The Court may properly consider the existence of court filings on a motion to dismiss.  *See Arista Recs. LLC v. Does 1–27*, 584 F. Supp. 2d 240, 244 (D. Me. 2008).

**Argument**

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The analysis has two steps. First, the Court should "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court should determine whether "the well-pleaded facts, taken in their entirety, permit 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). If the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed. *Iqbal*, 556 U.S. at 679. "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). This analysis requires the court to draw upon "its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## I.    The Complaint fails to state a claim under the NVRA

DOJ's NVRA claim is decidedly narrow. Unlike in Count II and III, wherein DOJ contends specifically that Defendants' refusal to produce records—namely, an unredacted voter file—violated HAVA and the CRA, respectively, Compl. ¶¶ 63, 65, Count I contains no such reference. Instead, DOJ alleges that its July 24 letter "requested . . . information that Maine is required to disclose," and that Defendants "failed to provide sufficient responses" to those "specific inquiries regarding its list maintenance procedures." *Id.* ¶¶ 57–58. It thus appears that DOJ's NVRA claim is not based on a refusal to produce the unredacted voter file violated the NVRA, but rather on the quality and scope of Defendants' answers to DOJ's questions.

There is no such claim under the NVRA.  The statute affords substantial discretion to the States to design, and operate, a list maintenance program.  *See* 52 U.S.C.A. § 20507(a)(4).  It contains no provision requiring States to respond, never mind provide *sufficient* answers, to DOJ inquiries.  Certainly, it may be in a State's interest to answer those inquiries because the Attorney General has authority to bring civil actions to enforce the NVRA.  But here, DOJ has not even contended that Maine's list maintenance procedures are insufficient to meet the NVRA's broad mandate.  Maine accordingly has not violated the NVRA by failing to answer DOJ's questions to its satisfaction.

That said, in the spirit of transparency and cooperation, Secretary Bellows provided detailed responses to DOJ regarding the State's regimented and extensive list maintenance procedures.  If DOJ was unsatisfied with those answers, it could have followed up with the Secretary and identified the additional information it required.  DOJ chose not to and instead filed this lawsuit.  DOJ cannot manufacture an NVRA claim by simply covering its ears.

To the extent DOJ intended to style its NVRA claim differently and target the Secretary's refusal to disclose an unredacted voter file, the NVRA requires no such disclosure.  The NVRA requires that each State "shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . . ."  52 U.S.C.A. § 20507(i)(1).  In the context of considering records requests by private organizations, several courts, including the First Circuit, concluded that this provision required states to disclose *some* data from states' voter registration databases.  *See, e.g.*, *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 47-49 (1st Cir. 2024) ("*PILF*"); *Publ. Int. Legal Found., Inc. v. N.C. State Bd. of Elecs.*, 996 F.3d 257, 266–67 (4th Cir. 2021).

Those decisions, however, do not control here for two reasons.  *First*, in *PILF*, wherein the First Circuit considered an as-applied preemption challenge brought by a private organization to Maine's law treating CVR data as confidential and limiting its use and dissemination, the plaintiff sought only a limited voter file that, among other things, omitted driver's license numbers and social security numbers, and provided only the year of each voter's birth.  92 F.4th at 42-43 (listing elements of requested "voter file").  In concluding that the plaintiff was entitled to that data free of then-existing restrictions in Maine law governing use and dissemination, the First Circuit expressly recognized that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" contained in the file.  *Id.* at 56. Indeed, its ruling hinged in part on the fact that "proper redaction of certain personal information in the Voter File can . . . assuage the potential privacy risks implicated by the public release of the voter file."  *Id.*  This conclusion reflected DOJ's own position in that case; it argued in an amicus brief that redactions of sensitive information are consistent with the NVRA.  *See Brief for the United States*, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23–1361 (1st Cir. July 25, 2024), 2023 WL 4882397, at \*27–28.

The First Circuit is not alone in interpreting the NVRA's disclosure provision to exclude sensitive PII.  Courts have recognized, for example, that requiring disclosure of social security numbers under the NVRA would make potential voters hesitant to register, "potentially undermin[ing] the voter registration goals of the NVRA."  *See, e.g., Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 712 (E.D. Va. 2010).  They have recognized that disclosure of voter birthdates, and the attendant risks of identity theft and other harms, likewise "contravenes the NVRA's purpose and historical bases for enactment, and would have the opposite effect than Congress intended."  *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739

(S.D. Miss. 2014).  For the same reasons, they have allowed states to redact not only birthdates and social security numbers, but telephone numbers, street numbers, identifying portions of email addresses, and other highly sensitive personal information.  *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 944 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022).  DOJ's demand for Maine's unredacted voter registration database encompasses all of these sensitive fields.

*Second*, the federal government is not the public.  Unlike the private plaintiff in *PILF*, or any other private citizen, DOJ's use and dissemination of citizens' PII is uniquely constrained by other statutes.  Specifically, as set forth in Parts IV and V below, the Privacy Act of 1974 sets forth a substantive prohibition on the federal government's collection of data relating to First Amendment–protected activities, and both the Privacy Act and the E-Government Act of 2002 impose important procedural safeguards before the federal government can collect PII.  As argued in Parts IV and V, DOJ has satisfied neither the procedural nor the substantive requirements to obtain Maine's voter file.  And because of the unique dangers associated with the federal government accruing vast troves of PII on its citizens, these privacy laws foreclose DOJ from obtaining even those portions of the voter file that are available to private requestors under state law.  *See, e.g.*, 21-A M.R.S.A. § 196-A(1)(K).

The NVRA's disclosure provision does not override these statutes.  A Congressional enactment must be interpreted as part of "a symmetrical and coherent regulatory scheme," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569 (1995), and "fit, if possible, all parts into an harmonious whole," *FTC v. Mandel Brothers, Inc.,* 359 U.S. 385, 389 (1959).  The meaning of a statute is, in other words, influenced by related statutes, especially when Congress has spoken specifically to the topic at hand  *See Food & Drug Admin. v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 132-33 (2000).

Both the Privacy Act and the E-Government Act are such statutes.  When Congress

passed the NVRA, it did not suggest, when it included a public disclosure requirement, that it

intended to override the general restrictions imposed on *government* by the Privacy Act.  *Cf.*

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016) ("[I]t is illogical that in

enacting the NVRA, Congress intended to erode Federal and State law protecting against the

disclosure of private, personal information.").  Further, when Congress passed the E-Government

Act of 2002, it did not exempt disclosures under the NVRA from its requirements.  Taken

together, then, when government fails to comply with the Privacy Act and the E-Government

Act, disclosure is not required.  Because, as set forth in Parts IV and V, DOJ did not comply with

those statutes here, Maine's refusal to disclose the voter file does not run afoul of the NVRA.

## II.    The Complaint fails to state a claim under HAVA

DOJ's HAVA claim turns on an alleged failure to "provide sufficient information in

response" to DOJ's letters, and on Defendants' refusal to provide an unredacted voter file.

Compl. ¶¶ 61–63.  Because HAVA requires neither, DOJ has failed to state a viable claim.

Like the NVRA, HAVA grants significant discretion to the States in determining how to

implement its tenets.  *See Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1172 (11th

Cir. 2008).  Indeed, it even contains a specific directive—presumably aimed at DOJ—that

"specific choices on the methods of complying with the requirements of [HAVA] *shall be* left to

the discretion of the State."  52 U.S.C.A. § 21085 (emphasis added).  And, unlike the NVRA,

HAVA contains no provisions that require the provision of records, or any information at all.

The statute simply requires Maine to establish a system of list maintenance that eliminates

duplicate names and makes a "reasonable effort" to remove ineligible registrants.  52 U.S.C.A.

§ 21083(a)(2)(B) & (4)(A).  Nowhere does it require, or create a mechanism for DOJ to request,

the disclosure of information to permit DOJ to "evaluat[e]" or "determine[e]" an individual

state's compliance. *See* Compl. ¶¶ 61–63; *see also* 52 U.S.C. § 21111 (authorizing Attorney

General to bring a civil action "to carry out the uniform and nondiscriminatory election

technology and administration requirements," without any reference to providing access to state

voter files on demand). Such a provision would not make sense in the HAVA context, given the

review of a static list of voters provides limited information on whether a state is taking

reasonable steps to remove ineligible voters "on a regular and ongoing basis" as HAVA requires.

*Benson*, 136 F.4th at 627.

That said, as in the NVRA context, Maine has carefully ensured its list maintenance

program complies with HAVA. *See* Compl., Ex. 2. Nowhere in DOJ's letters or Complaint has

it alleged an actual or suspected substantive violation of HAVA. Nor has DOJ explained why

the information provided by Secretary Bellows was insufficient to demonstrate that Maine

satisfies HAVA's modest "reasonable effort" requirement. There is accordingly no real or

perceived HAVA violation in which to ground DOJ's claim.

DOJ, in short, asks the Court to read into HAVA a disclosure requirement unsupported

by the statutory text so that DOJ may go fishing in an attempt to find a HAVA violation it does

not currently even suspect. Any claim based on a violation of HAVA is therefore meritless.

## III.    The Complaint fails to state a claim under the CRA

DOJ's CRA claim consists of two sentences. DOJ contends that it demanded that

Secretary Bellows produce records under 52 U.S.C.A. § 20703, and that she refused to do so.

Compl. ¶¶ 64–65. These allegations, for multiple reasons, are insufficient to state a CRA claim.

### A.    A demand for records under the CRA must be supported by a statement of basis and purpose consistent with the Act's scope.

The CRA requires that the Attorney General's demand for election records "contain a

statement of the basis and the purpose therefor."  52 U.S.C.A. § 20703.  The plain language of the statute—in particular the use of the definite article "the" before both "basis" and "purpose"—creates a bipartite requirement.  *See Confederated Tribes & Bands of Yakama Nation v. Yakama Cnty.,* 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'").  When seeking records under the CRA, the Attorney General must accordingly state the purpose for her request, namely the "objective, goal, or end," "Purpose," *Black's Law Dictionary* (12th ed. 2024), as well as the "basis" for her request, namely the "underlying fact or condition" that gives rise to it, "Basis," *id.*; *see also Kennedy v. Lynd,* 306 F.2d 222, 229 (5th Cir. 1962) (requiring that the Attorney General "adequately state[] the basis and the purpose" for its demand).

The two-pronged showing for records demands ensures that such demands are tethered to the constitutional ill addressed by the statute, namely voting-related discrimination.  The CRA was designed to protect the "key constitutional right of every American, the right to vote without discrimination on account of race or color."  "Statement by the President Upon Signing the Civil Rights Act of 1960," May 6, 1960, https://tinyurl.com/3ses36xe.  Yet there was a gap in existing law at the time, which then–Attorney General William Rogers described as a lack of  "power to require the production of election records during any investigation of complaints that qualified persons have been denied the right to vote in violation of federal law," without which "assembl[ing] the necessary proof of discrimination [was] impracticable, if not impossible."  Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong. 13-14 (Mar. 20, 1959), https://tinyurl.com/2caa3m27.[4]

---

[4] *See also* Proposed Civil Rights Legislation: Hearing Before the S. Comm. on the Judiciary, 86th Cong. 8 (Mar. 28, 1960) ("March 28, 1960 AG Statement") (statement of William P. Rogers, Att'y Gen. of the U.S.) at 8, https://tinyurl.com/ydx2y9wd (reiterating the Election Records Provision was "essential to the effective enforcement of the Civil Rights Act of 1957"); U.S. Comm'n on Civil Rights, *Report of*

Accordingly, at President Eisenhower's recommendation, *see* H.R. Doc. No. 75 (1st Sess. 1959), *reprinted in* 105 Cong. Rec. 1922 (Feb. 5, 1959), the records provision was adopted to "provide[] a more effective protection of the right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956 (Aug. 20, 1959), *reprinted in* 1960 U.S.C.C.A.N. 1925, 1944.

Against this backdrop, the very existence of the "purpose" and "basis" requirements demonstrates that Title III does not grant the Attorney General roving authority to request election records as she sees fit. Rather, they restrict the scope of such requests to the rights protected by the CRA by mandating that the Attorney General not only disclose how the records will be used ("the purpose"), but also confirm that there is an adequate factual predicate for believing that a violation of those rights has occurred ("the basis"). *See Lynd*, 306 F.2d at 228 (purpose of Title III is to allow for gathering of records "relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights" in order to allow Attorney General to fulfill "duties imposed upon him by the Civil Rights Act of 1957 and 1960"); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962) (valid statement of basis and purpose is "based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting").

**B.    DOJ has not stated a basis for their demand.**

Here, while DOJ has articulated a purpose, albeit an insufficient one as explained below, it did not even make a passing attempt to identify the basis for its request. In its letters, DOJ

---

*the U.S. Commission on Civil Rights, 1959*, at 137–38 (Sept. 9, 1959), https://tinyurl.com/24mddz2z (recommending Congress require states and localities to retain records and permit inspection to facilitate investigation of alleged voter discrimination).

simply stated that an unredacted voter file was necessary "to assist in [its] determination of whether Maine's list maintenance program complies with the NVRA." Compl. Ex. 3. Given DOJ's straightforward failure to comply with the CRA's requirement that it state the basis for its request, the Secretary had no obligation to comply with the request, and DOJ's CRA claim is legally deficient.

Tellingly, DOJ's initial filings in this case do not even attempt to cure this failure to state the basis. The Complaint's factual allegations say nothing about the basis for the CRA demand. Compl. ¶¶ 49, 64. Nor do they allege facts from which a plausible basis could be imputed. *Id.* ¶¶ 31–55. DOJ's motion for order to show cause likewise asserts only that the United States "informed the Defendant that the *purpose* of the request was to ascertain Defendant's compliance with federal law," omitting any mention of a basis. Mot. for OSC (ECF No. 5) 2–3 (emphasis added). The accompanying declaration confirms this in sworn testimony, explaining that DOJ "informed the Secretary that *the purpose* of the demand for these records was to ascertain Maine's compliance with the list maintenance requirements of federal laws, specifically the NVRA and HAVA." Riordan Decl. (ECF No. 5-5) ¶ 5 (emphasis added).

Nor can any basis be imputed from the DOJ's initial correspondence. Neither of the DOJ's letters to the Secretary identify any concern regarding HAVA or NVRA compliance, let alone *discriminatory* noncompliance. Compl, Ex. 1 & 3. Nor can the DOJ's questions to the Secretary in its July 24, 2025 letter be the "basis" for DOJ's request for the unredacted voter file since DOJ made its demand for the voter file before it received the Secretary's answers. Indeed, that DOJ did not ask the Secretary a single follow-up or clarifying question in response to her lengthy explanation statements, and has been seeking the same data from most if not all of the 50 States, confirms that DOJ's demand is not based on specific concerns about Maine's compliance

17

with the NVRA and HAVA at all.[5]

    **C.**    **DOJ's stated purpose is insufficient under the CRA.**

    DOJ's records demand is also facially invalid under the CRA for another important

reason. Its stated "purpose" for seeking an unredacted voter file is beyond the scope of the CRA.

    As set forth above, the "purpose" requirement is tied to, and limited by, the scope of the

CRA. *See United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201–02 (1979)

("It is a 'familiar rule that a thing may be within the letter of the statute and yet not within the

statute, because not within its spirit nor within the intention of its makers.'"). This limit is vital;

without it, the Attorney General could demand that states turn over sensitive voter data for any

reason, including a patently improper one. DOJ could, for example, demand the voter file to

target voters based on their party affiliation, or use it to confirm that certain voters had voted in a

---

    [5] Nor does the EAVS data referenced in the DOJ's July 24, 2025 letter supply any basis for suspecting noncompliance with HAVA or the NVRA. For example, DOJ inquired about Maine's rate of registered voters as a percentage of its citizen voting-age population (CVAP), which, at 92.4%, is about six points above the national average of 86.6%. Compl., Ex. 1, at 2; U.S. Election Assistance Commission, "Election Administration and Voting Survey 2024 Comprehensive Report" (June 2025), at 157 & 160, *available at* https://tinyurl.com/3frwk7n3. But an above-average percentage of registrations cannot reflect poor list maintenance if those registrants are voting. That is the case in Maine. According to the same EAVS data, Maine's 2024 election turnout as a percentage of its CVAP (74.8%) was even more of an outlier than its registration percentage, 10 points above the national average of 64.7%. *Id.* at vi–vii. Maine's percentage of registered voters who voted in the 2024 election (80.9%) is also significantly above the national average of 74.8%. *Id.* These high turnout statistics are inconsistent with the notion that Maine's registration numbers are inflated with large numbers of defunct registrations. Mainers are registered at higher rates because they vote at higher rates.

    Furthermore, registration rates as a percentage of CVAP are not a reliable indicator of reasonable list maintenance programs. The EAVS report itself identifies two problems with this approach. First, it notes that "2023 CVAP was used to calculate the 2024 registration rate"— meaning that the numerator and denominator for the calculation are taken from different time periods. *Id.* at 161. Second, it notes that "due to federal law, some ineligible voters may take up to two full election cycles to be removed from the voter registration rolls." *Id.*; *see also Bellitto v. Snipes*, 16-cv-61474, slip op. at 18–20 (S.D. Fla. March 30, 2018) (finding that a similar calculation did not support contention that official failed to comply with list-maintenance requirements); *aff'd* 935 F.3d 1192 (11th Cir. 2019), *available at* https://tinyurl.com/6efjyu52.

particular election.  The purpose requirement prevents such abuse.

Here, while the Attorney General's stated purpose of determining compliance with the NVRA and HAVA is comparatively benign, it is no less unmoored from the scope of the CRA. *Cf. Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (noting that statistical evidence in a CRA records-production proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry"). Because it is unrelated to voting-related discrimination, as protected by the CRA, this Court should determine that the Attorney General's stated purpose is invalid, such that Maine was not required to comply with the Attorney General's demand.

That said, Maine also has reason to believe that DOJ's stated purpose is not its actual goal.  If DOJ were concerned about NVRA or HAVA compliance, it stands to reason that it would seek records from the particular State that appear to not be complying with those statutes. But not only has DOJ failed to articulate any reasonable concern about NVRA or HAVA compliance in Maine, it also has not limited its unredacted voter file requests to a single state, or even a handful of states.  Instead, DOJ has sought an unredacted voter file from most if not all States and has commenced litigation against 18 states that have refused to comply.[6]

If this Court denies Maine's motion, Maine intends to seek discovery about what exactly DOJ's plans are, as public reporting and DOJ's own statements suggest far more troubling purposes than ensuring compliance with the NVRA and HAVA.  *See* Maine's Opp'n to Mot. for OSC 8–10.  For present purposes, however, DOJ's suspiciously broad records request; failure to articulate any concern about Maine's list maintenance procedures; and decision to not even ask follow-up questions demonstrate that it is implausible that DOJ's stated purpose is its true

---

[6] *See* n.3, *supra*.

purpose.  DOJ's CRA claim should therefore be dismissed.

**IV.    The Complaint establishes that its demand does not comply with the Privacy Act**

DOJ's claims also fail because its demand for the voter file violates the Privacy Act of 1974.  The Court can consider this affirmative defense in a motion to dismiss because "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude."  *Rodi v. S. New England Sch. of Law*., 389 F.3d 5, 12 (1st Cir. 2004).

**A.    The Complaint shows that DOJ seeks to collect data on Mainers' First Amendment–protected activities without an authorized purpose.**

"The Privacy Act of 1974 serves to safeguard the public interest in informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals."  *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 555 (S.D.N.Y. 1980).  It is designed, among other things, to prevent "the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch."  S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917.

Though many of the Privacy Act's provisions are procedural in nature, it flatly forbids federal agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C.A. § 552a(e)(7).  This prohibition reflects "Congress' own special concern for the protection of First Amendment rights."  *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980).

Each individual entry in Maine's voter file is a "record" under the Privacy Act of 1974.

The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . ."  5 U.S.C.A. § 552a(a)(4).  The voter file, in this vein, contains each voter's name as well as other "identifying particular[s]" about that voter, including their address, date of birth, and driver's license or partial social security numbers.  21-A M.R.S.A. § 152(1)–(2).

Additionally, the voter file indicates how each voter exercises rights guaranteed by the First Amendment in several ways.  *See id.*; 21-A M.R.S.A. § 721.  It identifies the political party, if any, in which the voter has chosen to enroll, an "integral part" of associational freedom under the First Amendment.  *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).  It notes which citizens have chosen to register to vote, a choice that "implicates political thought and expression."  *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999).  And it shows which Mainers chose to vote in which elections, an act in which voters "express their political preferences."  *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 31 (D.D.C. 1999) ("When a citizen steps into the voting booth to cast a vote on a matter properly on the ballot, he or she intends to send a message in support of or in opposition to the candidate or ballot measure at issue").  A federal database of such information is ripe for the very types of abuses—e.g., targeting voters based on their party affiliation—that the Privacy Act was enacted to prevent.

No statutory exception to the Privacy Act's prohibition applies here, either.  Federal collection of PII concerning millions of registered voters suspected of no wrongdoing is not "expressly authorized" by any statute.  5 U.S.C.A. § 552a(e)(7).  It is certainly also not authorized by the voters themselves.  *Id.*

It likewise cannot be plausibly argued that such a massive compilation of PII is "within the scope of an authorized law enforcement activity." *Id.* While HAVA and the NVRA give DOJ the authority to enforce their provisions, Congress, consistent with the Constitution's grant of authority to States as the primary administrators of federal elections, U.S. Const. art. I, § 4, expressly left it to the discretion of the States to determine "the methods of complying" with their list maintenance obligations, 52 U.S.C.A. § 21085. DOJ's role is limited to assessing *whether* the "program" and "system" chosen by the States make a "reasonable effort" to remove voters who have moved or died. 52 U.S.C.A. §§ 20507(a)(4), 21083(a)(4)(A).

Yet DOJ's complaint is notable for its lack of any explanation as to why it needs the sensitive PII of every Maine voter to make this assessment, and it is implausible that it does. To satisfy federal requirements, a state's list-maintenance program need only be "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Benson*, 136 F.4th at 625. Determining whether a state meets this standard requires review of its methodology and procedures, not a static compilation of all its voters' PII. Nonetheless, DOJ demanded Maine's voter list before it even received Maine's answers to its questions about the workings of Maine's list-maintenance program. *See* Compl. Ex. 1. Thus, whether DOJ's true purpose is to subject Maine to some sort of involuntary federal list-maintenance program or some other undisclosed purpose, its demand is not within the scope of "authorized" law enforcement activity.

**B.    DOJ has not notified the public and Congress of its data-collection efforts.**

DOJ's demand also violates the Privacy Act because DOJ has not properly notified the public and Congress of its intentions to compile a massive database of voter PII.

The Privacy Act requires federal agencies to publish public notices, called Systems of Records Notices (SORNs), with nine categories of information describing each "system of

records" held by the agency that contains records about individual Americans.  5 U.S.C.A. § 552a(e)(4).  The SORN must include categories of records maintained, categories of individuals contained in the records, expected "routine uses" of the records, categories of users, and policies governing access, storage, disposal.  *Id*.  The agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use.  *Id.* § 552a(e)(11).  Notice must also be provided to the Office of Management and Budget and Congress.  *Id.* § 552a(r).

In its Complaint, DOJ acknowledges that it is bound by the Privacy Act, Compl. ¶ 52, and points to a specific SORN, the "Central Civil Rights Division Index File and Associated Records" SORN, as amended, which it claims satisfies its Privacy Act obligations, *id*. ¶ 53; *see* 68 Fed. Reg. 47610–01 (Aug. 11, 2003).

Since DOJ does not say in its Complaint what it intends to do with Maine's voter file, a determination of whether DOJ's plans fall within the "routine uses" enumerated in the SORN would require discovery.  *See* Maine's Opp'n to Mot. for OSC 20–22.  However, no discovery is needed to conclude that the existing SORN is inadequate in other respects.

First, the Privacy Act requires the SORN to identify "the categories of individuals on whom records are maintained in the system."  5 U.S.C.A. § 552a(e)(4)(B).  Yet the SORN cited by DOJ lists only narrow categories of individuals, such as "subjects of investigations," "victims," and "potential witnesses."  68 Fed. Reg. 47610–01 at 47611.  None of the categories cited in the SORN can plausibly be read to include all of a state's registered voters.

Second, the SORN must include "the categories of records maintained in the system." *See* 5 U.S.C.A. § 552a(e)(4)(C).  Yet, again, the SORN lists the sort of unremarkable records one would expect in DOJ's files, such as "case files," "memoranda," and "reports."  Fed. Reg.

47610–01 at 47611.  No reasonable reader of the SORN would come away with the impression that DOJ's files will contain complete state voter registration databases with sensitive PII on millions of registered voters.

Finally, the Privacy Act requires that the SORN identify "the categories of sources of records in the system."  5 U.S.C.A. § 552a(e)(4)(I).  DOJ's SORN refers only to "an agency or person who has or offers information related to the law enforcement responsibilities and/or other statutorily-mandated duties of CRT."  This description does not alert a reasonable reader that the involuntary collection of entire state voter registration databases is a source of DOJ records.

DOJ is required to publish a new SORN whenever there is a "revision" to its system of records.  5 U.S.C.A. § 552a(e)(4).  The Office of Management and Budget interprets this provision to require a revised SORN if there is "[a] substantial increase in the number, type, or category of individuals about whom records are maintained in the system" or "[a] change that expands the types or categories of records maintained in the system."  OMB Circular A-108, Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act, at 5, https://tinyurl.com/3hkzbyr2.  DOJ's decision to begin collecting complete voter files from multiple states, containing PII on millions of voters as well as information on their First Amendment–protected activities, easily satisfies these standards.  The Court should therefore conclude that DOJ's demand is invalid under the Privacy Act.

## V.  DOJ's Demand Violates the E-Government Act.

DOJ's Complaint should also be dismissed because DOJ failed to conduct the privacy impact assessment required by the E-Government Act.

Under the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy, including any initiation of a new collection of information that will

be collected, maintained, or disseminated using information technology and that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." *Id.* § 208(b)(1)(A)–(B).

Maine's voter file, which includes names and mailing addresses and consists largely of voters' answers to standardized questions on the voter registration application, falls within the strictures of the privacy impact assessment requirement. Yet, despite Maine raising the E-Government Act in its initial correspondence with DOJ, *see* Compl., Ex. 2, at 4, neither the Complaint nor the correspondence from DOJ it attaches cites any privacy impact assessment. Absent citation to an applicable assessment by the DOJ, the Complaint should be dismissed for DOJ's failure to comply with the E-Government Act.

## Conclusion

For the reasons above, the Court should dismiss the Complaint.

Dated: December 12, 2025

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton

Jonathan R. Bolton
Jason Anton
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, ME 04333–0006
Tel. (207) 626–8800
jonathan.bolton@maine.gov
jason.anton@maine.gov