UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>SHENNA BELLOWS in her official capacity as Secretary of the State of Maine and the STATE OF MAINE,<br><br>　　　　　　　Defendants. | Docket No. 1:25-cv-00468 |

**MAINE'S OPPOSITION TO THE UNITED STATES'S
MOTION FOR ORDER TO SHOW CAUSE**

As demonstrated in Defendants Shenna Bellows's and the State of Maine's (together "Maine's") motion to dismiss, the Department of Justice's (DOJ's) demand for a complete, unredacted copy of Maine's entire voter registration database is not supported by the statutes on which it relies and, further, violates Mainers' privacy rights in several ways.

Should the Court decline to dismiss DOJ's complaint, it should nevertheless reject the extraordinary and fundamentally unfair process by which DOJ seeks adjudication of its claims. DOJ asks this Court to issue an order to show cause against Maine that appears intended to deprive it of virtually all of its procedural rights under the Federal Rules of Civil Procedure. DOJ goes so far as to suggest that the Court may summarily "order Defendants to produce [the voter database] immediately" with no further process at all—effectively ending the case. Mot. for OSC (ECF No. 5) at 3. DOJ rests its argument on a provision of Title III of the Civil Rights Act of 1960 (CRA), which confers jurisdiction on federal courts "by appropriate process to compel the production" of records sought by the Attorney General under 52 U.S.C.A. § 20703.

1

That jurisdiction-conferring language in the CRA cannot be fairly read to abrogate the Federal Rules of Civil Procedure.  To authorize "special statutory proceedings" that deviate from the federal rules, Congress must use language far more specific than that in the CRA—language that actually *describes* the alternate procedure.  The single decades-old out-of-jurisdiction decision cited by DOJ for the contrary provision is an anomaly that does not even reflect that Circuit's current jurisprudence on the question.

What is more, even if the CRA allows for some deviation from the rules, DOJ's proposed order-to-show-cause process should be rejected as deeply unfair.  If DOJ's untested allegations in the Complaint are deemed sufficient to survive Maine's motion to dismiss, Maine must have an opportunity to test them through discovery.  For example, DOJ alleges that it has satisfied the CRA's requirement that it state "the purpose" of its unprecedented demand for voter data by asserting that it is enforcing modest requirements in federal law that Maine establish a "general program" of list maintenance that makes "reasonable efforts" to remove certain ineligible voters. 52 U.S.C.A. § 20507(a)(4).  Yet statements by DOJ officials and other publicly available information suggest that DOJ has other purposes in mind, such as using voter data for criminal or immigration enforcement, feeding the data into an unreliable citizenship-verification system, or coopting all 50 states into an involuntary federal list maintenance program.  Maine should be permitted to probe whether DOJ has stated the true purpose of its demand, as the CRA requires. DOJ's other allegations, such as its allegations of compliance with the federal Privacy Act, Compl. ¶¶ 52–53, similarly cannot be tested without discovery into DOJ's intended uses of the data.

In short, the Court should deny DOJ's motion for order to show cause and instead treat this case as normal civil litigation subject to the Rules of Civil Procedure.

**Facts**

*Maine's Central Voter Registration System*

Since 2007, Maine has maintained a centralized electronic database of all Maine registered voters called the central voter registration system (CVR).  Declaration of Julie Flynn, dated December 12, 2025 ("Flynn Decl.") ¶ 7; *see* P.L. 2005, ch. 453, § 40.  CVR contains personally identifiable information (PII) on each of Maine's 1,039,579 registered voters.  Flynn Decl. ¶ 10.  CVR contains numerous data fields including name, residence address, mailing address, past addresses, phone number, email address, current and historical party enrollment, date of birth, date of registration, whether the voter cannot provide a signature due to physical disability, and history of all elections in which the voter has participated ("voter participation history").  *Id.* ¶ 9.  CVR also contains the number the voter provided on their voter registration application to verify their identity, which can be that voter's Maine driver's license number, nondriver identification card number, or the last four digits of their social security number.  *Id*; *see* 21-A M.R.S.A. § 152(1)(M).

Since the CVR's inception, the Maine Legislature has charged the Secretary with protecting the PII contained within it from unwarranted disclosure.  *See* P.L. 2005, ch. 404 (codified at 21-A M.R.S.A. § 196, recodified as amended at 21-A M.R.S.A. § 196-A).  Maine law designates CVR data as confidential and exempts it from Maine's public records law.  21-A M.R.S. § 196-A(1); 1 M.R.S.A. § 402(3)(A).  While an exception to that confidentiality law gives the Secretary discretion to provide certain CVR data to government entities upon request, that authority does not extend to bulk disclosure of PII like full date of birth, social security number, driver's license number, phone number, and email address.  *See* 21-A M.R.S.A. § 196-A(1)(E).  Indeed, Maine law expressly designates some of this PII, along with other categories of data, as "highly sensitive personal information" that cannot be disclosed even to

authorized requestors.  *Id.* § 196-A(1)(K)(2).  Maine law also forbids the Secretary from disclosing voters' party affiliation and voter participation history to other governmental entities. Flynn Decl. ¶ 12; *see also* 21-A M.R.S. § 196-A(1)(E).

### Federal and State Voter List Maintenance Requirements

Two federal laws, the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA), require States to conduct programs to maintain the accuracy and currency of their voter lists.  The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change in residence.  52 U.S.C.A. § 20607(a)(4).  Subject to certain restrictions designed to protect voters from being wrongfully purged from voting lists, the NVRA leaves it to the States to design and operate its list maintenance program as it sees fit.

HAVA introduced various election reforms in the wake of the 2000 presidential election, including a requirement that States maintain centralized voter registration databases. Specifically, states must adopt "a system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters."  *Id.* § 21083(a)(4)(A).  Importantly, while HAVA clarified that the NVRA's list maintenance requirements apply to the new voter registration databases, "[n]othing in HAVA broaden[ed] the scope of the NVRA's list-maintenance obligations."  *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019).  HAVA also, consistent with the NVRA, expressly provides that "specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State."  52 U.S.C.A. § 21085.

Like federal law, Maine law specifically provides for maintenance of the list of voters contained in CVR.  It authorizes the Secretary to conduct statewide maintenance of the CVR system and requires her to adopt rules for conducting NVRA-compliant voter list maintenance.

21-A M.R.S.A. § 161(2-A).  It likewise permits the Secretary to share CVR data with a nonprofit organization made up of member States for the purpose of maintaining the voter list.  *Id.* § 161(2-B).  Under this authority, Maine has become a member of the Electronic Registration Information Center (ERIC) and engages in list maintenance based on reports it receives from that entity.  Flynn Decl. ¶ 14.  Importantly, as DOJ concedes, data shared to ERIC is encrypted via "a cryptographic one-way hash," Compl. ¶ 54, meaning ERIC receives only encrypted codes ("hashes") representing voter data, which ERIC can compare with hashes from other states for matching purposes but cannot itself decrypt, *see* Flynn Decl. ¶ 15.  Maine law provides no similar authority for the Secretary to share CVR data with the federal government for list maintenance purposes, let alone unhashed data.  *Id.* ¶ 16.

The Secretary conducts rigorous maintenance of CVR consistent with these statutes. Earlier this year, the Secretary cancelled 180,584 registrations in CVR based on the results of a 2022 address-confirmation mailing to voters who had not participated in recent elections. Compl., Ex. 2, at 2; Flynn Decl. ¶ 13.  The Secretary plans to conduct a similar address-confirmation mailing by early 2026.  Flynn Decl. ¶ 13.  In addition, the Secretary has established multiple programs to cull the voter list of deceased voters and duplicate registrations.  Compl., Ex. 2 at 2–6; Flynn Decl. ¶ 13.

*The Department of Justice's Demand for Unredacted Voter Data*

In March 2025, President Trump issued an Executive Order ("EO") titled "Preserving and Protecting the Integrity of American Elections."  *See* Exec. Order 14,248, 90 Fed. Reg. 14005 (Mar. 25, 2025).  In addition to purporting to require users of the federally issued voter registration application to submit documentary proof of citizenship—a requirement that has since

been enjoined by multiple federal courts,[1]—the EO ordered the federal government to acquire and analyze state voter-list data.  Specifically, the EO directed that

> the Department of Homeland Security, in coordination with the DOGE Administrator, shall review each State's publicly available voter registration list and available records concerning voter list maintenance activities as required by 52 U.S.C. 20507, alongside Federal immigration databases and State records requested, including through subpoena where necessary and authorized by law, for consistency with Federal requirements.

*Id.* at § 2(b)(iii).

To date, Maine has not received any request directly from the Department of Homeland Security (DHS) or DOGE for voter data.  Declaration of Katherine McBrien, dated Dec. 12, 2025, ("McBrien Decl.") ¶ 17.  However, on July 24, 2025, DOJ sent a letter to the Secretary purporting to "request information regarding Maine's procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA]."  Compl., Ex. 1, at 1.  The letter asked a series of questions concerning Maine's list maintenance program under the NVRA and Maine's responses to the Election Assistance Commission's 2024 Election Administration and Voting Survey (EAVS).  *Id.* at 2–3.  DOJ's letter also included, without any explanation or justification, a demand for Maine's entire "computerized statewide voter registration list," including "all fields contained within the list."  *Id.* at 1.  DOJ cited the NVRA's public disclosure provision, 52 U.S.C.A. § 20507(i), as authority for its demand.  *Id.*

The Secretary responded to DOJ's letter on August 8, 2025, and provided a detailed explanation of Maine's list-maintenance program.  *See* Compl., Ex. 2., at 1-3.  The Secretary also answered each of DOJ's questions concerning EAVS data, explaining why the data cited by DOJ

---

[1]  *See California v. Trump*, 786 F. Supp. 3d 359, 396-97 (D. Mass. 2025) (preliminary injunction); *League of United Latin Am. Citizens v. Exec. Off. of President*, No. CV 25-0946, 2025 WL 3042704, at *38 (D.D.C. Oct. 31, 2025) (permanent injunction).

were not evidence of list-maintenance issues. *Id.* at 4–6. Further, in response to DOJ's demand for Maine's full unredacted voter list under the NVRA, the Secretary asked several questions about how it planned to use and protect the data, and whether its demand was consistent with federal privacy laws. *Id.* at 3–4.

DOJ, in turn, issued another letter on August 18, 2025, in which it reasserted its demand for the full unredacted voter file containing "all fields," including "date of birth," "state driver's license number," or "the last four digits of the registrant's social security number." Compl., Ex. 3, at 1. For the first time, however, it contended that its demand was made under HAVA and the CRA, in addition to the NVRA. *Id.* at 2. In response to the Secretary's concern that the demand for data might be inconsistent with federal privacy laws, DOJ stated only that "[a]ll data received from you will be kept securely and treated consistently with the Privacy Act." *Id.* at 3. Notably, after referencing the CRA's requirement that DOJ provide "the basis" and "the purpose" for any document requests, the letter stated "[t]he purpose of the request is to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA," but it did not identify any basis for the request. *Id.* at 2.

The Secretary responded to DOJ's second letter on September 8, 2025. McBrien Decl., Ex. A. She reiterated her concerns that the demand violated federal privacy laws. She likewise noted that DOJ's asserted "purpose" under the CRA was unrelated to the CRA's goals, that DOJ had likewise failed to provide any basis for its demand, and that HAVA lacks any mechanism under which DOJ can demand records. The Secretary invited DOJ to provide additional information addressing the concerns she set forth in her letter.

DOJ did not respond and instead filed the present action.

*Evidence that DOJ Has Different or*
*Additional Purposes for the Voter Data*

After DOJ sent its letters to Maine, evidence has mounted that its demand for Maine's unredacted voter database does not reflect any particularized concern about the adequacy of Maine's list-maintenance program under HAVA and the NVRA, but rather is part of an attempt to collect and compile sensitive information on every registered voter in the United States.  A brief description of that evidence follows.

*DOJ's Nationwide Demand Letters and Lawsuits*.  The nonprofit Brennan Center for Justice, which tracks DOJ voter-data demands, has determined that DOJ sent letters to at least 40 states demanding their full voter lists.  *See* "Tracker of Justice Department Requests for Voter Information," *Brennan Center for Justice*, https://tinyurl.com/tk33n8dv (last accessed Dec. 12, 2025).  DOJ has also, as of the date of this filing, commenced actions in 17 additional states seeking to obtain unredacted copies of those state voter lists.[2]

*Statements by DOJ.*  The National Association of Secretaries of State (NASS) is a nonpartisan professional organization that conducts regular meetings attended by secretaries of state and their staff.  McBrien Decl. ¶ 5.  At NASS's August 28, 2025 meeting, Deputy Attorney General Michael Gates spoke about DOJ's data-collection efforts.  *Id.* ¶ 6.  DAG Gates stated

---

[2]  *See United States v. Oregon*, 6:25-cv-01666 (D. Or.) (filed Sept. 16, 2025); *United States v. Simon*, 0:25-cv-03761 (D. Minn.) (filed Sep. 25, 2025); *United States v. Benson*, 1:25-cv-01148 (W.D. Mich.) (filed Sept. 25, 2025); *United States v. Pennsylvania*, 2:25-cv-01481 (W.D. Penn.) (filed Sept. 25, 2025); *United States v. Bd. Of Elecs.*, 1:25-cv-01338 (N.D.N.Y.) (filed Sep. 25, 2025); *United States v. Scanlan*, 1:25-cv-00371 (D.N.H.) (filed Sept. 25, 2025); *United States v. Weber*, 2:25-cv-09149 (C.D. Cal.) (filed Sept. 25, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del.) (filed Dec. 2, 2025); *United States v. Demarinis*, 1:25-cv-03934 (D. Md.) (filed Dec. 2, 2025); *United States v. Oliver*, 1:25-cv-01193 (D.N.M.) (filed Dec. 2, 2025); *United States v. Amore*, 1:25-cv-00639 (D.R.I.) (filed Dec. 2, 2025); *United States v. Hanzas*, 2:25-cv-00903 (D. Vt.) (filed Dec. 2, 2025); *United States v. Hobbs*, 3:25-cv-06078 (W.D. Wash.) (filed Dec. 2, 2025); *United States v. Galvin*, 1:25-cv-13816 (D. Mass.) (filed Dec. 11, 2025); *United States v. Nago*, 1:25-cv-00522 (D. Haw.) (filed Dec. 11, 2025); *United States v. Griswold*, 1:25-cv-03967 (D. Colo.) (filed Dec. 11, 2025); *United States v. Aguilar*, 3:25-cv-00728 (D. Nev.) (filed Dec. 11, 2025).

that DOJ would be seeking unredacted voter lists from all 50 states.  *Id.* ¶ 9.  He further stated that DOJ intended to analyze the voter data and provide feedback to States with the goal of producing "clean" voter lists free of ineligible voters.  *Id.* ¶ 10.  DAG Gates declined to answer questions about the methodology that DOJ would use.  *Id.*  However, his statements suggested that at least part of DOJ's plan involves feeding States' voter registration data into one or more electronic matching systems and providing the results back to States with the expectation that they would cancel or otherwise correct the allegedly problematic registrations before the November 2026 election.  *Id.* ¶ 11.  The Secretary of State is concerned that one such matching system may be the Systematic Alien Verification for Entitlements (SAVE) program, which the federal government is currently in process of expanding despite reliability and other concerns expressed by numerous secretaries of state, including Maine's.  *Id.* ¶¶ 15–16, Ex. C.

*Press Statements*.  A September 2025 news article describes an unsigned statement by DHS referencing a "collaboration with the DOJ" that involved "sharing information" and would "enable DHS to prevent illegal aliens from corrupting our republic's democratic process and further ensure the integrity of our elections nationwide" and "scrub aliens from voter rolls." Jonathan Shorman, "DOJ is sharing state voter roll lists with Homeland Security," *Stateline* (Sept. 12, 2025), https://tinyurl.com/257x8yba.  A second article, published by *Reuters*, maintains that based on "government documents seen by Reuters," DOJ was "in talks" with DHS to transfer states' voter data to DHS "for use in criminal and immigration-related investigations." Sarah N. Lynch, "US Justice Dept considers handing over voter roll data for criminal probes, documents show," *Reuters* (Sept. 9, 2025), https://tinyurl.com/273xye2n.  A third article, published in the *New York Times*, suggests that the Trump Administration is seeking to "essentially establish a national voting database."  Devlin Barrett and Nick Corasaniti, "Trump

Administration Quietly Seeks to Build National Voter Roll," *New York Times* (Sept. 9, 2025),

https://tinyurl.com/5n78c2v6.[3]

## Argument

**I.     This action should proceed under the Federal Rules of Civil Procedure.**

As a general matter, the Federal Rules of Civil Procedure "govern the procedure in all civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1; *cf. Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000) (interpreting similar language to "apply to any proceedings in a court of justice by which an individual pursues a remedy which the law affords" (quoting *Weems v. McCloud*, 619 F.2d 1081, 1088 (5th Cir. 1980))). The Supreme Court has repeatedly endorsed this "uniform and regular civil procedure laid down by the Federal Rules," such that absent "express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law." *N.H. Fire Ins. Co,. v. Scanlon*, 362 U.S. 404, 407–08 (1960); *accord Daly v. United States*, 393 F.2d 873, 876 (8th Cir. 1968) ("Except when expressly authorized by statute[,] summary procedures are to be substituted for plenary actions only in narrowly defined special situations."); *S.E.C. v. Wencke*, 783 F.2d 829, 837 n.9 (9th Cir. 1986) ("We agree that courts should be 'reluctant' to authorize the use of summary proceedings unless there is a strong reason for doing so."). That "express statutory authorization" consists of "procedures and remedies specifically tailored to a limited subset of cases." *N.Y. Times v. Gonzalez*, 459 F.3d 160, 166 (2d Cir. 2006).

---

[3] On November 18, 2025, 10 Secretaries of State, including Secretary Bellows, based in part on these reports, sent a letter to the Attorney General and Secretary of Homeland Security seeking clarification of the federal government's purposes in seeking voter data from the states. McBrien Decl., Ex. B. To date, neither official has provided a written response. *Id.*

Here, the Government filed a traditional civil complaint seeking the production of records. The principal statutes governing that production, namely the NVRA and the CRA,[4] do not expressly or impliedly create a special statutory proceeding, nor do they direct or authorize departure from the usual course of civil litigation.

### A.    The CRA does not authorize a special statutory proceeding.

The CRA provides, in relevant part, that "[a]ny record or paper required under section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General," which "shall contain a statement of the basis and the purpose thereof," be "made available for inspection." 52 U.S.C.A. § 20703. It further provides that the federal district court "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

Neither of these provisions expressly authorizes a special statutory proceeding. Nor does either identify "procedures . . . specifically tailored" to an enforcement action under the statute. *Contrast Katzenbach v. McClung*, 379 U.S. 294, 296 (1964) (recognizing that a corresponding provision in the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000a-5, creates a "special statutory proceeding"); *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 931–32 (11th Cir. 1990) (recognizing that Federal Arbitration Act, which sets forth a series of rules and procedures, creates a special statutory proceeding in which the federal rules are applicable only where the Act is silent). In fact, they do nothing "special" at all, in that they refer to an "appropriate process" without further specification.

---

[4] As set forth in the concurrently filed motion to dismiss, HAVA contains no records production provision. *See* Maine's Mot. to Dismiss 13-14.

Lest there be any doubt, the U.S. Supreme Court and multiple federal courts of appeals have found that this precise language—"appropriate process"—does *not* give rise to a special statutory proceeding. *See, e.g., United States v. Powell*, 379 U.S. 48, 58 n.18 (1964) (concluding that because 26 U.S.C. § 7604(a), a provision of the tax code which permits the enforcement of summonses by "appropriate process," "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply"); *accord United States v. McKay*, 372 F.2d 174, 175 (5th Cir. 1967); *Application of Howard*, 325 F.2d 917, 919 (3d Cir. 1963).

There is accordingly no basis in the statute for treating actions brought under the CRA as anything other than traditional civil proceedings. *Cf. In re Application of Chevron Corp.*, 736 F. Supp. 2d 773, 786 n.56 (S.D.N.Y. 2010) (deeming action to compel discovery under 28 U.S.C. § 1782 to be a suit governed by the Federal Rules of Civil Procedure); *Glen 6 Assocs., Inc. v. Dedaj*, 770 F. Supp. 225, 228 (S.D.N.Y. 1991) (refusing to permit summary proceeding in landlord/tenant dispute where "[n]o authorization for summary adjudication . . . is provided in the federal rules of procedure nor in any other statute governing procedure in the district court"). In fact, Maine is unaware of a single instance in the last five decades in which the Attorney General has sought an order to show cause under her CRA enforcement authority.

DOJ's argument nonetheless rests on a single, 63-year-old decision from the Fifth Circuit: *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mem. of Law (ECF No. 5-1) at 8. In that case, the Court noted that the "application" by the Attorney General for an order compelling production did not initiate a traditional civil action, but rather a "special statutory proceeding" in which some Federal Rules of Civil Procedure did not apply. *Id.* at 225–27.

*Lynd* should not guide the Court here. It is a single decision from outside this Circuit, issued at a unique historical moment at which the validity of "question[s] concerning infringement or denial of voting rights" was beyond dispute. *Id.* at 228. The decision has not been cited on a single occasion by any federal court for the proposition that the CRA creates a special statutory proceeding in over 40 years. Further, while the Attorney General in *Lynd* filed an "application" with the court, *id.* at 225, here DOJ has litigated this case like an ordinary civil proceeding. It filed a traditional civil complaint and moved for the Court to issue an order to show cause consistent with the federal rules.

*Lynd* also does not reflect the current state of law, even in the Fifth Circuit. In *Weems*, the Fifth Circuit reasoned that Georgia law created a special statutory proceeding precisely because the statute specified "the issues to be litigated and the procedure to be followed," both of which are absent from the CRA. 619 F.2d at 1097. And while *Weems* cited *Lynd*, it (a) analogized the action at issue in *Lynd* to one brought under Rule 81, *see Weems*, 619 F.2d at 1096 n.35, under which proceedings for the production of documents are by default governed by the federal rules, *see* Fed. R. Civ. P. 81(a)(5), and (b) reiterated the Supreme Court's observation in *New Hampshire Fire Insurance Co.* that "courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law" absent "express statutory authorization," *Weems*, 619 F.2d at 1095 n.34.

Therefore, and particularly in the context of this case, there is no basis in the statute or governing case law for reading the CRA as creating a special statutory procedure.

**B.    The NVRA does not authorize a special statutory proceeding.**

DOJ does not expressly ask the Court to issue an order to show cause based on the NVRA. *See* Mot. for Order to Show Cause 2–3. However, it suggests in passing that the NVRA

also creates a special statutory proceeding akin to the one that the Government maintains is created by the CRA, *see* Mem. of Law 8. The NVRA does no such thing.

While DOJ was at least able to unearth a decades-old case in support of its position that the CRA creates a special statutory proceeding, it does not cite a single authority suggesting that the NVRA does the same. Instead, it simply asserts that the NVRA uses "materially identical language" to the CRA and therefore must also create a special statutory proceeding. *See* Mem. of Law 8. There are multiple flaws with this reasoning.

*First*, as explained above, the CRA does not create a special statutory proceeding, such that it offers no reason to conclude that NVRA does.

*Second*, the language in the NVRA is not materially identical to the CRA. The NVRA requires states to make documents available for *public* inspection, *see* 52 U.S.C.A. § 20507(i)(1), whereas the CRA both refers specifically to requests from the *Attorney General*, *see id.* § 20703, and grants the district court discretion "by appropriate process to compel the production," *id.* § 20705.

*Third*, years of NVRA lawsuits have followed the standard litigation track. *See, e.g., Judicial Watch v. Illinois State Board of Elecs.*, 2024 WL 4721512, No. 24 C 1867 (N.D. Ill. Oct. 28, 2024); *Public Interest Legal Foundation v. Knapp*, 749 F. Supp. 3d 563 (D.S.C. 2024); *Voter Reference Foundation, LLC v. Torrez*, 727 F. Supp. 3d 1014 (D.N.M. 2024); *Public Interest Legal Foundation v. Bellows*, 588 F. Supp. 3d 124, 129 (D. Me. 2022). Therefore, if the language of the CRA and the NVRA is "materially identical," then the way in which NVRA claims have been litigated for years is an indication that the CRA does *not* create a special statutory proceeding, and not the other way around.

**II.    Even if the CRA and NVRA create a special statutory proceeding, they do not authorize or require summary relief.**

In special statutory proceedings, consistent with the plain language of Rule 1, the Federal Rules of Civil Procedure are not entirely jettisoned.  *See, e.g, Daly*, 393 F.2d at 876 ("[I]n the absence of specific procedures set forth [in statute], the Federal Rules of Civil Procedure are generally applicable.").  Instead, courts have recognized that the "Federal Rules of Civil Procedure *may* be applied less rigidly" in such proceedings "where a strict application of the rules would frustrate the statutory purpose."  *Booth v. Hume Pub., Inc.*, 902 F.2d 925, 931 (11th Cir. 1990) (emphasis added); *accord Weems v. McCloud*, 619 F.2d 1081, 1094–97 (5th Cir. 1980).  In other words, the authorizing statute itself, and the purpose it serves, direct the cadence of litigation against the backdrop of the full federal rules.

Congress did not, in either the CRA or the NVRA, set forth a summary mechanism for adjudicating a records demand.  The statutes do not, in fact, identify *any* procedures for a district court to follow beyond the CRA's reference to "appropriate process."  Without an indication that any Federal Rules of Civil Procedure should not followed, or express identification of an alternate course of proceeding, the federal rules should remain "generally applicable."  *Daly*, 393 F.2d at 376.

DOJ likewise has not identified a reason why adhering to any of the Federal Rules of Civil Procedure would frustrate the purposes of the CRA or the NVRA.[5]  Permitting adversarial testing of the Government's expansive demand for sensitive records, including discovery on the

---

[5] While Federal Rule of Civil Procedure 81(a)(5) grants the district court discretion to depart from the federal rules by court order where the government seeks to compel production of documents through a subpoena issued under a federal statute, *see, e.g., Donaldson v. United States*, 400 U.S. 517, 528–29 (1971), no such subpoena has been issued here, nor, for the reasons stated, is there justification for departing from the Federal Rules of Civil Procedure here.

purpose and basis of that demand, does not undermine enforcement of the civil rights protections set forth in the CRA, or the requirement that states maintain a system of voter list maintenance under the NVRA. *Compare Usery v. District No. 22, United Mine Workers of Am.*, 567 F.2d 972, 974 (10th Cir. 1978) (permitting intervention would expand remedies beyond those permitted by statute); *Weems*, 619 F.2d at 1095 (counterclaims would frustrate summary proceeding created by Georgia statute by delaying and changing the character of judicial determination of the fairness of foreclosure). Nor, for that matter, has DOJ sought emergency relief in this case or identified any reason why time is of the essence.

Absent such a showing, the adjudication of DOJ's claims, even in the context of a special statutory proceeding, should at the very least include discovery, briefing, and the presentation of evidence to the Court. *See Wencke*, 783 F.2d at 836–37 (approving use of summary proceedings where "the parties . . . had notice concerning the nature of the proceedings, were permitted extensive discovery, . . . were permitted to file briefs and exhibits with the district court, and . . . except for dispensing with the filing of a complaint and answer, the district court applied the Federal Rules"); *cf. McGarry's,. Inc. v. Rose*, 344 F.2d 416, 418 (1st Cir. 1965) (requiring at least "an adversary-type hearing" before being required to comply with an administrative summons under the tax code). A simple summary proceeding is inappropriate and not contemplated by the statutes at issue.

## III.    The United States's demand for records under the CRA and NVRA is deficient on its face.

DOJ's motion is also meritless because it rests on a faulty premise. For DOJ to shift the burden to Maine to demonstrate why the Court should *not* order the production of records, DOJ had to establish that it had made a valid demand for those records in the first place. It did not.

16

As set forth in Maine' Motion to Dismiss, DOJ's demand for Maine's unredacted voter file is fatally flawed in multiple ways. As for its demand under the CRA, DOJ did not state—or even imply—a basis for its demand as required by statute; failed to identify a purpose for its demand that falls within the scope of the CRA; and, as discussed further below, may not have even disclosed the *actual* purpose for its records demand at all. *See* Maine's Mot. to Dismiss 19. As to DOJ's demand under the NVRA, the statute has been repeatedly interpreted by federal courts to not require the disclosure of the sensitive voter information that DOJ seeks. *See id.* at 11-12. Further, DOJ is not the public, such that its failure to comply with both the Privacy Act of 1974 and the E-Government Act of 2002 renders its demand for Maine's unredacted voter file invalid. *See id.* at 12-13.

## IV.    If DOJ's demand is not facially deficient, then discovery is needed to determine its validity.

Even if the Court were to determine that a special statutory proceeding is authorized, and that DOJ's claims do not fail as a matter of law, an abbreviated order-to-show-cause process would still be fundamentally unfair because it would not allow for the discovery necessary for Maine to adequately and fairly defend itself against DOJ's claims. DOJ's true purpose for seeking highly sensitive voter data from Maine; its plans for storing, using, and disseminating that data both inside and outside the federal government; and its justification for seeking that data may be relevant both to the validity of DOJ's demand and whether and to what degree that demand and compliance with it violates the Privacy Act and E-Government Act. Maine should therefore be permitted to take discovery on these issues before the Court passes judgment on whether the requested sensitive voter data must be produced.[6] Any procedure that dispenses

---

[6] Discovery would also ensure Maine is, at the very least, on no worse footing than the recipient of an administrative subpoena would be. In such cases, pursuant to the corresponding "narrow" but

with such discovery would inflict irreparable harm on Maine and its voters whose privacy rights are at stake.

A.     **Maine should be permitted to probe DOJ's purpose and any basis for its demand under the CRA.**

When seeking voting records under the CRA, DOJ must state both "the basis" and "the purpose" for that demand.  52 U.S.C.A. § 20703.  DOJ has asserted that its "purpose" in seeking Maine's voter file is to "assist in our determination of whether Maine's list maintenance program complies with the NVRA."  Compl., Ex. 3 at 2.  Assuming *arguendo* that this is a facially valid purpose if accurate, *but see* Maine's Mot. to Dismiss 18–19, there are several indications that DOJ's statement of purpose is incomplete, if not outright inaccurate.  DOJ's efforts to obtain full voter lists from all 50 states, as well DAG Gates' statements indicating that it intends to analyze the voter lists and provide states with feedback on specific registrations, suggest that DOJ intends to operate *its own* list maintenance program, rather than evaluate whether States' programs make the requisite "reasonable effort" to remove ineligible voters.  52 U.S.C.A. § 21083(a)(4)(A).  News reports and statements indicating that DOJ will be sharing voter lists with DHS to "enable DHS to prevent illegal aliens from corrupting our republic's democratic process," is in talks with DHS to use voter data "in criminal and immigration-related investigations," and is seeking to "establish a national voting database," *see* pp. 8–9, *supra*, further cast doubt on the veracity and completeness of DOJ's stated purpose.

---

"potent" judicial review*, Secur. & Exch. Comm. v. Arthur Young & Co.*, 584 F.2d 1018, 1024 n.39 (D.C. Cir. 1978), the agency seeking enforcement "must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena," *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 3–4 (1st Cir. 1996).  The discovery described above is relevant to each of these inquiries.

DOJ's demand under the CRA is invalid if it has misstated the purpose of the demand. The statute's use of the definite article—"*the* purpose"—indicates that DOJ must state its *actual* purpose, not simply a plausible one.  52 U.S.C.A. § 20703; *see Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 32 (1st Cir. 2022) (observing that use of the definite article particularizes the referenced subject and suggests reference to a single object).  Further, even if the CRA permitted investigations beyond the context of racial discrimination, it strains credulity to read the CRA as authorizing DOJ to demand election records for purposes beyond its statutory powers (e.g., to create its own list maintenance system), or for purposes entirely unrelated to elections, such as "criminal and immigration-related investigations."

Maine cannot probe these important factual issues without the opportunity for discovery. DOJ has thus far refused to voluntarily answer most of the questions posed to it by Maine and other states.  *See* Compl, Exs. 1–3; McBrien Decl. ¶ 8 & Ex. A.  And while the news reports cited above are suggestive of different or additional DOJ purposes, they are not conclusive. Only discovery will permit Maine to collect the admissible evidence that it would need to effectively contest whether DOJ has accurately represented the purpose for its demand for Maine's unredacted voter file.

The same applies to discovery regarding "the basis" for DOJ's demand.  Maine contends in the first instance that DOJ's demand is deficient as a matter of law because it fails to contain *any* statement of the basis for the demand.  *See* Maine's Mot. to Dismiss 16-17.  But should the Court disagree, the statute at the very least requires DOJ to *have* a basis for believing an investigation is necessary when it invokes its powers under the CRA.  The known facts make the existence of such a basis doubtful here.  Among other things, DOJ's decision to seek voter lists from all 50 states strongly suggests that it is not acting based on a belief that any particular

state's list-maintenance program is unreasonable.  DOJ likewise requested Maine's voting list before it even received answers from Maine to its questions regarding list maintenance, further suggesting that DOJ's demand was not based on a concern regarding compliance with the NVRA or HAVA.  Accordingly, if the Court does not dismiss DOJ's claims on their face, Maine should be permitted to take discovery on whether DOJ had a legitimate basis for its demand.

### B. Maine should be permitted to probe whether DOJ's planned uses of Maine's voter file are consistent with federal privacy laws.

In its Motion to Dismiss, Maine showed why DOJ's demand for voter data is invalid as a matter of law because it runs afoul of both the Privacy Act and the E-Government Act.  *See* Maine's Mot. to Dismiss 20-25.  If DOJ's claims survive Maine's motion, Maine should have the opportunity to take discovery on whether DOJ has complied with these statutes.

*Privacy Act.*  The Privacy Act of 1974 prohibits, among other things, "the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch."  S. Rep. No. 93-1183 (1974), *reprinted in* 1974 U.S.C.C.A.N. 6916, 6917.  To this end, it requires federal agencies to publish public notices, called Systems of Records Notices (SORNs), with nine categories of information describing each "system of records" held by the agency that contains records about individual Americans. 5 U.S.C.A. § 552a(e)(4).  Such description must include categories of records maintained, categories of individuals contained in those records, expected "routine uses" of the records, categories of users of the records, and policies and procedures governing access, storage, disposal.  *Id.*  The relevant agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use. *Id.* § 552a(e)(11).  Notice must also be provided to the Office of Management and Budget and Congress.  *Id.* § 552a(r).

In its Complaint, DOJ acknowledges the applicability of the Privacy Act to its demand, pointing to a SORN[7] that it alleges contains the "full list of routine uses" for the voter data that DOJ seeks to collect from Maine. Compl. ¶ 53. That SORN, on its face, fails to provide notice to the public that DOJ will be maintaining searchable electronic records containing the sensitive PII of every registered voter in the United States. *See* Maine's Mot. to Dismiss 22-24. But should DOJ's claims proceed, Maine should be permitted to take discovery on whether DOJ's planned uses of the voter data are consistent with the limitations in the existing SORN upon which DOJ relies. For example, DOJ seemingly intends to use unspecified matching technology to analyze the voter file and identify registrations it believes to be invalid. McBrien Decl. ¶ 11. If true, such a use of voter data would go far beyond mere investigation and enforcement of the NVRA's and HAVA's requirements that States adopt a reasonable list maintenance program. Rather, DOJ would be usurping list-maintenance functions from the States in direct violation of Congress's directive that the "methods of complying" with federal list-maintenance obligations are to be determined by the States. 52 U.S.C.A. § 21085. Yet the existing SORN's list of "routine uses" says nothing about any such DOJ-run list maintenance program. *See* 68 Fed. Reg. 47610-01 at 47611-12.

Similarly, the record suggests that DOJ may plan to disseminate some or all of the voter file to other federal agencies, including DHS. While the SORN's list of "routine uses" allows for dissemination of records to other agencies for certain enumerated purposes, such as to assist in an investigation, it does not allow for dissemination for the purpose of voter list maintenance activities. *See id.* Discovery would illuminate with which agencies DOJ plans to share Maine's

---

[7] The nearly complete SORN, entitled "Central Civil Rights Division Index File and Associated Records," can be found at 68 Fed. Reg. 47610-01 (Aug. 11, 2003). The other two notices cited in the Complaint make minor, immaterial additions to the 2003 SORN without restating it in full.

sensitive voter data and whether it plans to do so for purposes consistent with the limitations set forth in the SORN.

Adequacy of the SORN aside, the Privacy Act also flatly prohibits federal agencies from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."  5 U.S.C.A. § 552a(e)(7).  The voter file contains precisely such data, including each voters' party enrollment, if any, and a history of whether they voted in each election.  DOJ's demand for the voter file violates this provision as a matter of law.  *See* Maine's Mot. to Dismiss at 20–22.  But, if DOJ's claims proceed, Maine should be permitted to take discovery on whether the voter file will, in fact, be used by DOJ for "authorized law enforcement activity."  For example, if, as reports suggest, DOJ is seeking the list in collaboration with DHS to attempt to identify noncitizens, such a purpose would not be authorized by the NVRA and HAVA grant of enforcement authority to DOJ, as neither statute requires States' list-maintenance programs to monitor voters' citizenship status.  *See* 52 U.S.C.A. §§ 20507(a)(4); 21083(a)(4)(A); *Snipes*, 935 F.3d at 1202.

*E-Government Act*.  Under the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy.  *Id.* § 208(b)(1)(A)–(B).  Such actions include any new collection of information that is collected, maintained, or disseminated using information technology involving "any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical

22

reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government."  *Id.* § 208(b)(1)(A)(ii).

Maine's voter file, which includes names and mailing addresses and consists largely of voters' answers to standardized questions on the voter registration application, falls within the strictures of the privacy impact assessment requirement.  Yet DOJ does not allege it has completed any applicable privacy impact assessment in its Complaint.  Nor did DOJ respond to the Secretary of State's questions regarding whether it complied with the E-Government Act.  Compl. Ex 3; McBrien Decl. ¶ 8 & Ex. A.  Unless DOJ is willing to concede that it has not conducted the required privacy assessment, Maine should be permitted to take discovery to establish that DOJ's demand for the voter file violates the E-Government Act.

## Conclusion

For the reasons above, the Court should deny the motion for order to show cause.

Dated: December 12, 2025

AARON M. FREY
Attorney General

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Jason Anton
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, ME 04333–0006
Tel. (207) 626–8800
jonathan.bolton@maine.gov
jason.anton@maine.gov