## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA,

                Plaintiff,

v.

SHENNA BELLOWS, in her official capacity as
the Secretary of State of Maine,
and the STATE OF MAINE,

                Defendants.

Case No. 1:25-cv-468-LEW

## INTERVENORS JOHN SCHNECK AND MARPHEEN CHANN'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 2

I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers. ................................................... 2

II.    DOJ embarks on a nationwide campaign to collect voter data held by states. .................. 4

III.    DOJ sues Maine as part of its effort to create a national voter list. .................................... 6

LEGAL STANDARD ................................................................................................. 7

ARGUMENT ............................................................................................................ 8

I.    DOJ's complaint fails to allege a cognizable violation of the NVRA. .............................. 8

II.    DOJ fails to allege a cognizable violation of HAVA. ...................................................... 11

III.    DOJ fails to allege a cognizable violation of the Civil Rights Act of 1960 ...................... 13

      A.    The Civil Rights Act of 1960 was designed to combat the denial of voting rights based on race ......................................................................................... 13

      B.    By its plain text, Title III does not cover Maine's internally created statewide voter registration list. ............................................................................. 14

      C.    DOJ lacks a proper basis and purpose to demand Title III records. ...................... 18

      D.    Title III does not prohibit redacting sensitive voter information. ......................... 20

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advoc. Health Care Network v. Stapleton,*
     581 U.S. 468 (2017) .................................................................................... 15, 16

*Alabama ex rel. Gallion v. Rogers,*
     187 F. Supp. 848 (M.D. Ala. 1960) ................................................................ 13

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
     570 U.S. 1 (2013) ................................................................................................ 3

*Ashcroft v. Iqbal,*
     556 U.S. 662 (2009) ........................................................................................... 8

*Bell Atl. Corp. v. Twombly,*
     550 U.S. 544 (2007) ........................................................................................... 9

*Brown v. Bank of Am., N.A.,*
     5 F. Supp. 3d 121 (D. Me. 2014) ...................................................................... 8

*CFPB v. Accrediting Council for Indep. Colleges & Sch.,*
     854 F.3d 683 (D.C. Cir. 2017) ........................................................................ 19

*CFPB v. Source for Pub. Data, L.P.,*
     903 F.3d 456 (5th Cir. 2018) .......................................................................... 18

*Fischer v. United States,*
     603 U.S. 480 (2024) ........................................................................................ 17

*Foster v. Love,*
     522 U.S. 67 (1997) ............................................................................................. 2

*Honeycutt v. United States,*
     581 U.S. 443 (2017) ........................................................................................ 16

*Huddleston v. United States,*
     415 U.S. 814 (1974) ........................................................................................ 16

*Husted v. A. Philip Randolph Inst.,*
     584 U.S. 756 (2018) ........................................................................................... 3

*In re Admin. Subpoena No. 25-1431-019,*
     No. 1:25-MC-91324-MJJ, 2025 WL 2607784 (D. Mass. Sep. 9, 2025) ........... 19

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962) ................................................................. 19

*In re Subpoena No. 25-14131-014*,
    No. MC 25-39, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) ........................... 19

*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025) ......................................................................................... 15

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ...................................................................... 19, 20

*Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*,
    844 F.3d 318 (1st Cir. 2016) ............................................................................... 4

*Loughrin v. United States*,
    573 U.S. 351 (2014) ......................................................................................... 15

*Martin v. Applied Cellular Tech., Inc.*,
    284 F.3d 1 (1st Cir. 2002) ............................................................................... 8, 9

*McCloskey v. Mueller*,
    446 F.3d 262 (1st Cir. 2006) ............................................................................ 12

*Morales-Cruz v. Univ. of P.R.*,
    676 F.3d 220 (1st Cir. 2012) .............................................................................. 7

*New England Cleaning Servs., Inc. v. Am. Arb. Assoc.*,
    199 F.3d 542 (1st Cir. 1999) .............................................................................. 7

*Prewett v. Weems*,
    749 F.3d 454 (6th Cir. 2024) ............................................................................ 16

*Project Vote, Inc. v. Kemp*,
    208 F. Supp. 3d 1320 (N.D. Ga. 2016) ............................................................ 10

*Project Vote/Voting For Am., Inc. v. Long*,
    752 F. Supp. 2d 697 (E.D. Va. 2010) ............................................................... 10

*Pub. Int. Legal Found., Inc. v. Bellows*,
    92 F.4th 36 (1st Cir. 2024) ....................................................................... *passim*

*Pub. Int. Legal Found., Inc. v. Matthews*,
    589 F. Supp. 3d 932 (C.D. Ill. 2022) ............................................................... 10

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
   996 F.3d 257 (4th Cir. 2021) ........................................................... 10

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
   120 F.4th 390 (4th Cir. 2024) ............................................................ 3

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010) ............................................................. 9

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) ............................................. 10

*United States v. Cadden*,
   965 F.3d 1 (1st Cir. 2020) ............................................................... 17

*United States v. Carpenter*,
   941 F.3d 1 (1st Cir. 2019) ............................................................... 17

*Voter Reference Found., LLC v. Torrez*,
   Nos. 24-2133 and 24-2141, 2025 WL 3280300 (10th Cir. Nov. 25, 2025) ..................... 10

*Watt v. W. Nuclear, Inc.*,
   462 U.S. 36 (1983) .......................................................................... 20

*Ysleta Del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022) ........................................................................ 16

**Constitutional Provisions, Statutes, Rules, and Regulations**

U.S. Const. art. I, § 4, cl. 1 ................................................................... 2

5 U.S.C. § 55 ......................................................................................... 20

6 U.S.C. § 1502 .................................................................................... 16

13 U.S.C. § 214 .................................................................................... 16

18 U.S.C. § 1709 .................................................................................. 16

18 U.S.C. § 2721 .................................................................................. 20

30 U.S.C. § 1732 .................................................................................. 16

50 U.S.C. § 217 .................................................................................... 16

52 U.S.C. § 20501 .................................................................................. 3

52 U.S.C. § 20507.................................................................................................. 3, 8, 9, 18

52 U.S.C. § 20701............................................................................................... *passim*

52 U.S.C. § 20703......................................................................................... 14, 15, 17, 18

52 U.S.C. § 21083.......................................................................................... 3, 12, 17, 20

52 U.S.C. § 21085...................................................................................................... 3, 18

52 U.S.C. § 21111............................................................................................................ 12

11 C.F.R. § 9428.7............................................................................................................ 5

21-A M.R.S.A. § 196-A(1)......................................................................................... 1, 20

Fed. R. Civ. P. 12(b)(6)................................................................................................... 7

**Other Authorities**

Br. for the U.S. as Amicus Curiae at 28, Pub. Int. Legal Found., Inc. v. Sec'y of
        Commonwealth of Pa., 136 F.4th 456 (3d Cir. 2023) (No. 23-1590), 2023 WL
        7486717......................................................................................................... 11

Br. for the U.S. as Amicus Curiae, *Project Vote/Voting for America Inc. v. Long*, 752
        F. Supp. 2d 697 (E.D. Va. 2010) (No. 11-1809), 2011 WL 4947283 ............... 11

Br. for the U.S. as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*,
        92 F.4th 36 (1st Cir. 2024) (No. 23-1361), 2023 WL 4882397.................................. 10, 11

*Come into possession*, Cambridge Dictionary, https://dictionary.cambridge.org/us
        /thesaurus/come-into-possession-of (last visited Dec. 6, 2025)......................... 14

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build
        National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD ........... 4

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y.
        Times (Nov. 16, 2025),
        https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-
        department-staff-attorneys.html......................................................................... 6

H.R. Rep. No. 86-956 (1960).......................................................................................... 13

H.R. Rep. No. 107-329 (2001)............................................................................ 2, 4, 12, 17

Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (2025), https://perma.cc/S95X-NQBT ............................................................................ 5

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Ctr. for Just. (Dec. 12, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information ................................................................ 4

*Receive*, *Black's Law Dictionary* (12th ed. 2024) ...................................................... 14

**INTRODUCTION**

The United States Department of Justice ("DOJ") seeks to build a nationwide voter registration list, a scheme not authorized by Congress and contrary to federal laws assigning states the responsibility for overseeing voter registration. To build this unauthorized and unprecedented federal list, DOJ has demanded that over 40 states turn over their full, unredacted voter lists, even though state laws often protect sensitive voter information contained in those lists—most notably driver's license numbers, partial social security numbers, and dates of birth—from disclosure. Maine law is no exception: It deems such information "confidential" and carefully restricts when and how it can be disclosed by state election officials. *See* 21-A M.R.S.A. § 196-A(1).

Because Maine—like nearly every other state contacted by DOJ—has so far refused to comply with its demands, DOJ has amplified its pressure campaign by filing suit to forcibly obtain the state's voter registration list. *See* Compl. ¶ 4. Far from granting such relief, this Court should dismiss this action under Rule 12(b)(6) because DOJ has failed to state a claim—no federal law authorizes its demand for Maine's full unredacted voter list and the complaint fails to plausibly allege otherwise. Each of DOJ's contrary theories fail as a matter of law. DOJ claims that the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA") sanction its demands. But those are the very statutes that task *states*—not the federal government—with maintaining voter lists. Most critically, nothing in either statute requires states to disclose their full, unredacted voter lists, as the First Circuit held just last year. *See Pub. Int. Legal Found., Inc. v. Bellows* ("*PILF*"), 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files.). DOJ also invokes Title III of the Civil Rights Act of 1960, a civil rights era statute that permits DOJ to access certain materials that election officials receive from voters—such as registration

forms—to investigate racially-motivated restrictions on the right to vote. But that statute has no application here, not least of all because it extends only to "records and papers which come into [election officials'] possession." 52 U.S.C. § 20701. State voter registration lists are internal documents *created* by election officials—unlike a voter registration form, a state's voter list never "come[s] into" election officials' "possession." Title III therefore does not reach Maine's internally generated statewide voter registration list.

Tellingly, DOJ's complaint nowhere identifies past instances where any of these laws have been used to obtain the sort of sensitive voter information it seeks here. The reason why is clear: such an effort has never been tried before and runs contrary to the purposefully decentralized structure of our federal electoral system. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (giving the states principal authority over congressional elections). Indeed, when enacting HAVA after the contested 2000 elections, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329, pt. 1, at 31–32 (2001). DOJ's suit therefore asserts an unprecedented federal authority over the management of federal elections yet cites no federal law that supplies such sweeping authority. Accordingly, the Court should dismiss the complaint with prejudice under Rule 12(b)(6) for failure to state a claim.

## BACKGROUND

### I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining

lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. Congress in 1993 enacted the NVRA to serve "two main objectives: increasing voter registration and removing ineligible persons from the states' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). Tellingly, that law charges *states*—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including as to maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)-(g). It similarly makes *states* the custodians of voter lists. *See Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted HAVA "to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). HAVA directed states to create a "computerized statewide voter registration list" that "contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1). HAVA further commands that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into" the list "at the time the information is provided to the local official" and that election officials "shall coordinate[] with other agency databases within the State" in creating and maintaining the list. *Id.* Like the NVRA, HAVA is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). And more generally, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085. Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

*See* H.R. Rep. No. 107-329, at 31–32. And while HAVA requires states to *create* and *maintain* a centralized statewide voter registration list, nothing in the law obligates them to *disclose* such lists—or indeed, any records—to anyone, including to the federal government.

## II.    DOJ embarks on a nationwide campaign to collect voter data held by states.

This spring, DOJ launched an unprecedented campaign to demand broad access to state voter files, which include sensitive and personal information about each registered voter. To date, DOJ has sent demands to over 40 states, with plans to make similar demands on all fifty.[1] It seeks to use the data to create a national voter database that will, in turn, be used to attempt to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections.[2] The vast majority of states that have received such demands—including those led by Republican office holders—have refused to comply, declining to turn over sensitive information that is typically protected by state law. *See supra* note 1.

DOJ sent Maine its demand letter on July 24, 2025, seeking Maine's "computerized statewide voter registration list." ECF No. 1-1. DOJ asked Secretary Bellows about Maine's list maintenance efforts. ECF No. 1-1 at 2. DOJ also posed several questions about Maine's responses

---

[1] Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Dec. 12, 2025), https://www.brennancenter.org/our-work/research-reports/tracker-justice-department-requests-voter-information; *see also Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 331 (1st Cir. 2016) (highlighting how merely considering "extrinsic documents" is not enough, on its own, to convert a motion to dismiss into a motion for summary judgment).

[2] *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sept. 9, 2025), https://perma.cc/8VP4-WRXD.

to Election Administration and Voting Survey ("EAVS") prompts.[3]

In response, Secretary Bellows noted the "unprecedented" nature of DOJ's request, which was not "correlated with legitimate investigatory needs," and asked DOJ to state its "purpose" in seeking Maine's statewide voter registration list. ECF No. 1-2 at 1. At the same time, she thoroughly answered DOJ's questions and provided a comprehensive overview of Maine's process for identifying and removing ineligible voters. *Id.* at 2–6. She recounted Maine's voter removal efforts from 2007 through 2025, explaining that Maine cancelled over 726,000 voter registrations in that period. *Id.* at 2. She detailed Maine's most recent efforts at list removal, including its "largest address-confirmation mailing" in history, which ultimately led to the cancellation of over 180,000 registrations after the 2024 election. *Id.* She also answered each of DOJ's questions about Maine's EAVS survey responses. *Id.* at 4–5. And she attached a 2024 report to the Maine Legislature further describing her office's list maintenance activities. *Id.* at 3.

DOJ responded on August 18. *See* ECF No. 1-3. Apparently satisfied with Maine's responses, the August 18 letter did not ask follow-up questions regarding Maine's list maintenance activities. *See id.* Instead, the letter was "limited" to renewing DOJ's "request for Maine's voter registration list." ECF No. 1-3 at 1. Despite having already received detailed answers from Secretary Bellows, DOJ asserted that the "purpose of the request [was] to ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* at 2. For the first time, DOJ also claimed that the Civil Rights Act of 1960 sanctioned its demands. *Id.* at 2.

In response, Secretary Bellows reasserted objections to producing an unredacted copy of

---

[3] EAVS is a biennial survey of state and local election officials administered by the U.S. Election Assistance Commission ("EAC"). *See* 11 C.F.R. § 9428.7. EAC reports its findings to Congress and the public after each regular federal election cycle. *See* Karen L. Shanton, Cong. Rsch. Serv., IF13056, *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (2025), https://perma.cc/S95X-NQBT.

Maine's voter registration list. *See* ECF No. 10-4.[4]

### III.     DOJ sues Maine as part of its effort to create a national voter list.

DOJ filed this suit on September 16, primarily seeking to compel Maine to produce its full, unredacted statewide voter registration list. Compl. at 18. It also seeks an order requiring Maine to produce certain "voter registration and maintenance records," though the complaint fails to specify what particular records it is seeking. *See id.*

DOJ claims it is entitled to relief under the NVRA, HAVA, and the Civil Rights Act of 1960. But the specific relief it seeks under each of these claims is muddled. First, DOJ alleges that Maine violated the NVRA by "fail[ing] to provide sufficient responses" to DOJ's "specific inquiries"—apparently referencing its questions to Secretary Bellows, not its request for Maine's statewide voter registration list. Compl. ¶¶ 57−58. Though DOJ's NVRA claim is, on its face, limited to challenging the sufficiency of Maine's written responses to DOJ's questions, the complaint fails to identify any specific deficiencies in those responses or to demand any specific form of relief related to the same. *Id.* at 18. DOJ next claims Maine violated HAVA by not providing "sufficient" responses to its questions and by refusing to provide DOJ with an unredacted copy of Maine's statewide voter registration list. *Id.* ¶¶ 61−63. But, again, DOJ identifies no specific issues with Maine's responses. Finally, DOJ claims Maine violated the Civil Rights Act of 1960 by not producing "the records requested." *Id.* ¶¶ 64−65.

This is not the only lawsuit that DOJ has brought against states that have refused to acquiesce to its broad demands for unredacted private voter information. This suit was among the

---

[4] Subsequent reporting validates her concerns. For example, a DOJ attorney tasked with working on cases demanding state voter data reported that DOJ was "dishonest" in its stated intentions with the data. Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. Times (Nov. 16, 2025), https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

first wave, when DOJ also sued Oregon. *See* Compl., *United States v. Oregon*, No. 6:25-cv-1666 (D. Or. Sep. 16, 2025). Next, DOJ sued California, Michigan, Minnesota, New Hampshire, New York, and Pennsylvania.[5] Last week, DOJ launched a third wave of these lawsuits, this time suing Delaware, Maryland, New Mexico, Rhode Island, Vermont, and Washington.[6] And yesterday, DOJ sued Colorado, Hawaii, Massachusetts, and Nevada.[7] But in an implicit acknowledgement of the weakness of its NVRA and HAVA claims, DOJ dropped those claims from its third and fourth waves of these suits, even though it leads with those claims here.

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court is not required to accept legal conclusions as true when considering a motion to dismiss." *New England Cleaning Servs., Inc. v. Am. Arb. Assoc.*, 199 F.3d 542, 545 (1st Cir. 1999). Instead, "the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012) (citing *Ashcroft v.*

---

[5] *See* Compl., *United States v. Weber*, No. 2:25-cv-9149 (C.D. Cal. Sep. 25, 2025); Compl., *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. Sep. 25, 2025); Compl., *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Sep. 25, 2025); Compl., *United States v. Scanlan*, No. 1:25-cv-371 (D.N.H. Sep. 25, 2025); Compl., *United States v. Bd. of Elections of N.Y.*, No. 1:25-cv-1338 (N.D.N.Y. Sep. 25, 2025); Compl., *United States v. Schmidt*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025).

[6] *See* Compl., *United States v. Albence*, No. 1:25-cv-01453 (D. Del. Dec. 2, 2025); Compl., *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md. Dec. 1, 2025); Compl., *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 2, 2025); Compl., *United States v. Amore*, No. 1:25-cv-00639 (D.R.I. Dec. 2, 2025); Compl., *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt. Dec. 1, 2025); Compl., *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. Dec. 2, 2025).

[7] *See* Compl., *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. Dec. 11, 2025); Compl., *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025); Compl., *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025); Compl., *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. Dec. 11, 2025).

*Iqbal*, 556 U.S. 662, 677 (2009)); *see also Iqbal*, 556 U.S. at 678 (explaining courts need not accept "legal conclusions" as true at the motion to dismiss stage). "In other words, '[i]f a plaintiff's claims do not establish recognized legal theories for which relief may be granted, the court must dismiss the complaint.'" *Brown v. Bank of Am., N.A.*, 5 F. Supp. 3d 121, 123–24 (D. Me. 2014) (alteration in original) (citation omitted).

## ARGUMENT

DOJ's complaint only squarely seeks one form of relief—compelled disclosure of Maine's entire state voter registration list. Compl. at 18. Such relief, if granted, would be unprecedented. DOJ cites three statutes to justify this demand: (1) the NVRA; (2) HAVA; and (3) the Civil Rights Act of 1960. Compl. ¶¶ 56–65. But none of these laws supply "any cognizable [legal] theory" for DOJ's requested relief. *Martin v. Applied Cellular Tech., Inc.*, 284 F.3d 1, 6 (1st Cir. 2002). Separately, DOJ vaguely alleges that Secretary Bellows failed to provide "sufficient responses" to DOJ's "specific inquiries," Compl. ¶ 58, and opaquely demands declaratory relief stating that Maine has failed to turn over unspecified "voter registration and maintenance records," *id.* at 18. These half-baked and conclusory allegations also fail to state a claim.

## I.    DOJ's complaint fails to allege a cognizable violation of the NVRA.

As a threshold matter, DOJ fails to plead a claim that Maine violated the NVRA by refusing to provide its unredacted voter registration list. Its NVRA claim instead focuses solely on the sufficiency of Maine's responses to DOJ's letters. *See* Compl. ¶¶ 56–58 (vaguely alleging Maine failed to provide "sufficient responses" to "specific inquiries"). But Maine has no statutory obligation to answer DOJ's questions *at all*. Through the NVRA, Congress charged states with making "reasonable effort[s]" to perform list maintenance, 52 U.S.C. § 20507(a)(4), but it never required states to report the results of that maintenance to DOJ or answer DOJ's inquiries about

their list maintenance activities. DOJ's claim thus has no basis in the law and should be dismissed on that basis alone. *See Martin*, 284 F.3d at 6.[8]

Based on its other filings, DOJ appears to believe that it has pled a claim to Maine's full unredacted voter list under the NVRA. *See* Mem. In Support of Mot. For Order to Show Cause at 7, ECF No. 5-1. Though its complaint does not comport with DOJ's apparent belief, even if DOJ had clearly mapped its claim that Maine violated the NVRA onto the relief requested—i.e., for production of Maine's full, unredacted voter file—that claim would necessarily fail as well. There is only *one* disclosure provision in the NVRA, and it simply requires states "maintain for at least 2 years and [] make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Not only does the NVRA not include any other disclosure provisions, it does not include any provision that grants the federal government special inspection rights beyond those available to the public as set forth explicitly in Section 20507(i).

As a result, binding First Circuit precedent forecloses DOJ's claim that the NVRA entitles it to Maine's entire unredacted voter list. Specifically, in *PILF*, the First Circuit held that though some information on Maine's voter list is subject to disclosure under the NVRA, sensitive and private voter information contained on the list—exactly what DOJ seeks here—is not. 92 F.4th at

---

[8] Even if the NVRA did require Maine to answer DOJ's questions, DOJ's allegations are woefully inadequate. DOJ claims Maine failed to provide "sufficient responses" to "specific inquiries." Compl. ¶¶ 56–58. What specific inquiries have gone unaddressed? And how are Maine's responses insufficient? DOJ does not say—a telling silence considering the level of detail Secretary Bellows provided in response to DOJ's letters. *See supra* Background § II. DOJ's complaint thus amounts to nothing more than "labels and conclusions" about the sufficiency of Maine's responses. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). DOJ's "meager, vague, [and] conclusory" allegations offer "mere conjecture" as to any substantive NVRA or HAVA violation, requiring dismissal. *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

43–44, 56 (citing 21-A M.R.S.A. § 196-A(1)(J)(1)–(2)). *PILF* concerned a challenge to a Maine law that made the list available for purchase but restricted the use and publication of the list by purchasers. *See id.* The Court held that while the list was a "record" covered by Section 20507(i), *see id.* at 45–49, it was also the case that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files, such as driver's license numbers, partial social security numbers, and dates of birth. *Id.* at 56 (approving of the "appropriate redaction of [certain] personal information" in Maine's voter list). The NVRA's public inspection provisions therefore do not preempt or circumvent the Maine legislature's lawfully enacted privacy requirements, which prohibit disclosure of the highly sensitive personal information DOJ seeks. And while DOJ pretends otherwise, the federal government has no special inspection rights under the NVRA and there is no lawful basis for grafting bespoke inspection rules for DOJ into that statute. As a result, reading the NVRA to authorize DOJ's request here would mean extending similar inspection rights to the public writ large. *PILF* rejects that notion. And while *PILF* alone ultimately controls here, the opinion noted that its holding on redaction was widely shared by courts across the country. *See id.* at 56 (collecting authority).[9]

That holding should come as no surprise to DOJ—it filed an amicus brief in *PILF* urging the Court to make just such a holding. *See* Br. for the U.S. as Amicus Curiae at 27–30, *PILF*,

---

[9] *See also Voter Reference Found., LLC v. Torrez*, Nos. 24-2133 and 24-2141, 2025 WL 3280300, at *9 n.14 (10th Cir. Nov. 25, 2025) (agreeing with *PILF*); *Project Vote*, 682 F.3d at 339 (affirming district court order to redact social security numbers before disclosure under NVRA); *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021) (recognizing that NVRA permits redactions to "protect sensitive information"); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (similar); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the

*supra*, 2023 WL 4882397. While arguing that Maine's limitations on the use and publication of the voter registration list were preempted by the NVRA, DOJ recognized that the state's "privacy concerns" were "substantial." *Id.* at 27. To that end, DOJ's brief "emphasize[d] the limits on [§ 20507(i)'s] preemptive scope." *Id.* Most notably, DOJ conceded that "the NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters' Social Security Numbers before disclosing records." *Id.* (quoting *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012)). It further conceded that the NVRA does not "prohibit [states from] redacting an even broader set of personal information in certain sensitive circumstances." *Id.* (citing *N.C. State Bd. of Elections*, 996 F.3d at 267). These views reflect longstanding DOJ beliefs, as the agency made similar arguments on several occasions, including more than a decade prior. *See* Br. for the U.S. as Amicus Curiae at 28, *Pub. Int. Legal Found., Inc. v. Sec'y of Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2023) (No. 23-1590), 2023 WL 7486717; Br. for the U.S. as Amicus Curiae at 11, *Project Vote*, *supra* (No. 11-1809), 2011 WL 4947283. DOJ's current demand that Maine produce an entirely unredacted voter registration file reflects an unexplained reversal of its longstanding and (correct) view.

## II.    DOJ fails to allege a cognizable violation of HAVA.

The next statute DOJ points to—HAVA—also does not support its demand. Indeed, DOJ's claim to relief under HAVA is even more baseless than its NVRA claim. Unlike the NVRA, HAVA contains *no* disclosure requirements *at all*. DOJ's complaint, correspondence, and motion for an order to show cause fail to cite any authority to the contrary, relying instead upon a provision permitting the Attorney General to file suit "as may be necessary to carry out the uniform and

---

disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding that the NVRA permits redacting social security numbers).

nondiscriminatory election technology and administration requirements" of HAVA. 52 U.S.C. § 21111. But the underlying statutory provisions DOJ may enforce through Section 21111 say nothing about states being obliged to turn over their voter rolls to DOJ. To the contrary, the sole underlying provision concerning voter registration—*id.* § 21083—affirms that voter registration lists must be "maintained" and "administered at the State level"—*not* by the federal government. *Id.* § 21083(a)(1)(A); *see also* H.R. Rep. No. 107-329, at 32, 36 (emphasizing that "local control must be preserved" under HAVA and voter registration databases should be "administered at the state level"). Nothing in HAVA provides any basis for DOJ to compel disclosure of information that the Constitution and federal law both instruct to be administered at the state level.

It would defy logic to conclude that HAVA implicitly authorizes the disclosure of all voter information, including sensitive and personal information protected by state law. The First Circuit has already held that the NVRA—which includes an *express* but limited public disclosure provision—permits states to redact sensitive and personal voter information. *PILF*, 92 F.4th at 43–44. HAVA—which does not contain a disclosure requirement of any sort—cannot then somehow be read to have broader preemptive effect on state privacy laws than the NVRA. And the mere fact that HAVA grants the Attorney General a cause of action to enforce HAVA's substantive requirements changes nothing because those substantive requirements include no obligation to disclose records to the federal government. DOJ otherwise makes no allegation whatsoever that Maine is violating the requirements of HAVA. The federal government, as much as any litigant, is not permitted to "conduct fishing expeditions in hopes of discovering claims that they do not know they have." *McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006). The Court should dismiss DOJ's HAVA claim for failure to state a claim.

12

III.     **DOJ fails to allege a cognizable violation of the Civil Rights Act of 1960.**

Finally, Title III of the Civil Rights Act of 1960, a long dormant law passed in the civil rights era to combat racial discrimination in voting in Jim Crow states, *see* 52 U.S.C. § 20701 *et seq.*, also does not support DOJ's demands in these circumstances. The Court should accordingly dismiss this claim as well.

A.     **The Civil Rights Act of 1960 was designed to combat the denial of voting rights based on race.**

Congress enacted Title III to buttress protections against racial discrimination in voting in the Civil Rights Act of 1957. *See* H.R. Rep. No. 86-956, at 3 (1960) (finding that while "some progress" has been made since the 1957 Act toward the "elimination of discrimination because of race," there was a "need for additional legislation to implement the enforcement of civil rights"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) ("The legislative history leaves no doubt but that [Title III] is designed to secure a more effective protection of the right to vote."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961).

In the Civil Rights Act of 1957, Congress tasked DOJ with protecting the "right of all qualified citizens to vote without discrimination on account of race." H.R. Rep. No. 86-956, at 7. Despite this charge, DOJ's efforts were stymied by "the refusal of some state and local authority to permit" inspection of certain voter records. *Id.* DOJ had "no existing power in civil proceedings to require the production of [voter registration] records during any investigation" concerning "complaints of a denial to vote because of race." *Id.* Congress found that without granting DOJ a "suitable provision for access to voting records during the course of an investigation," its ability to combat racial discrimination in voting was "rendered relatively ineffective." *Id.* Congress thus enacted Title III to assist DOJ "during any investigation it may conduct on complaints of a denial to vote because of race." *Id.*

Title III has two relevant parts. First, Section 301 requires election officials to retain for twenty-two months "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Section 303 then requires election officials to make such records available for inspection by the Attorney General upon receiving a "demand . . . contain[ing] a statement of the basis and the purpose" for the inspection. *Id.* § 20703.

### B.    By its plain text, Title III does not cover Maine's internally created statewide voter registration list.

DOJ's effort to invoke Title III fails from the start because, by its plain terms, it does not require the production of Maine's voter registration list—or any internal records generated by election officials. Title III permits DOJ to access records that "come into [the] possession" of election officials relating to a voter "application, registration, payment of poll tax, or other act requisite to voting." *Id.* § 20701. To "come into possession" of something means to receive or acquire it from someone else. *See, e.g.*, *Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"); *Come into possession*, Cambridge Dictionary, https://dictionary.cambridge.org/us/thesaurus/come-into-possession-of (last visited Dec. 6, 2025) (listing synonyms of "come into possession" as "obtain," "acquire," and "receive"). In other words, Title III extends to records that election officials receive or acquire. Here, DOJ seeks Maine's "computerized statewide voter registration list," Compl. ¶¶ 31, 48, 63—an internal database *created* by Maine election officials. *See PILF*, 92 F.4th at 42 (noting Maine election officials "generate" the voter registration list from its central voter registration system, which it also "created" pursuant to HAVA). Simply put, DOJ does not seek a record—like a registration application—that "c[a]me into [the] possession" of Maine officials. 52 U.S.C. § 20701. It is therefore not a record "required by section 20701 . . . to be retained and preserved," *id.*

§ 20703, and thus not within the scope of DOJ's demand authority under Title III, *id.*

Apparently aware of this flaw, DOJ's motion to show cause ***twice*** erases this language from the statute, blatantly misquoting the statute to omit the phrase "come into his possession" after the term "all records and papers." *Compare* ECF No. 5-1 at 1 ("each State must 'retain and preserve . . . all records and papers relating to any . . . act requisite to voting in [a federal] election" (alterations in original)), *and id.* at 4 ("States must produce 'all records and papers relating to any . . . act requisite to voting in [a federal] election' to the Attorney General upon her request" (alterations in original)), *with* 52 U.S.C. § 20701 ("all records and papers ***which come into his possession*** relating to any . . . act requisite to voting in such election" (emphasis added)). While stopping just short of misquoting Section 20701, DOJ's complaint and August 18 letter make substantially the same mischaracterization. *See* Compl. ¶ 29; ECF No. 1-3 at 2.

DOJ's effort to recast the text of Title III must be rejected. The "cardinal principle" of statutory interpretation is "that courts must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotation marks omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). Accordingly, Congress's choice to draft Title III to specifically reach only records and papers that "come into [the] possession" of election officials must be accorded respect and given its plain meaning. To do otherwise would "nullify Congress's purposeful choice of language." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 773 (2025). That is particularly so since Congress "did not adopt 'obvious alternative' language," *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (quoting *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014)), such as "all papers and records *in the possession*" of election officials, rather than merely those that "come" into the possession of such officials. Congress's choice to adopt the latter formulation carries "the natural implication is that they did not intend the

alternative." *Id*.

Indeed, Congress frequently employs the phrase "in the possession of" when it means to do so. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a). In the comparatively few instances where Congress has employed the phrase "come into his possession," it has done so in contexts where, as here, it was referring to materials that an individual or entity received from an outside source. *See, e.g.*, 18 U.S.C. § 1709 (similarly prohibiting a postal employee from stealing postal material that "comes into his possession"); 50 U.S.C. § 217 (requiring a solider to turn over captured or abandoned property that "comes into his possession"); 13 U.S.C. § 214 (prohibiting a census worker from publishing or disclosing material that "comes into his possession"). To interpret such phrases "in possession" and "come into possession" identically—as DOJ seeks—would erase a purposeful drafting choice from Congress and strip the Civil Rights Act's text of its plain meaning. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (noting "presumption" that "differences in language . . . convey differences in meaning" (citation omitted)); *Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2024) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." (alteration in original) (quoting *United States v. Ressam*, 553 U.S. 272, 276–77 (2008))).

Once Title III is properly construed in view of its full text, DOJ's claim collapses. A legion of Supreme Court and First Circuit decisions—many relying on dictionaries contemporaneous to the Civil Rights Act of 1960—have held that to "come into possession" of something means to receive, acquire, or obtain it from some other source. *E.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820

16

(1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting *Webster's New International Dictionary* (3d ed. 1966))); *United States v. Cadden*, 965 F.3d 1, 39 (1st Cir. 2020) (defining "obtain" as "to come into possession of" (quoting *Honeycutt*, 581 U.S. at 449)); *United States v. Carpenter*, 941 F.3d 1, 9 (1st Cir. 2019) (defining "acquire" as "to come into possession" of). DOJ cannot claim Secretary Bellows received, obtained, or acquired Maine's statewide voter registration list from elsewhere.

Further, in striving to give effect to every word and phrase in a statute, a court must consider the "specific context" of the phrase being interpreted and the "broader context of the statute as a whole." *Fischer v. United States*, 603 U.S. 480, 486 (2024) (citation omitted). The specific context of "come into [the] possession" in Title III is that it covers a voter's "application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. §§ 20701, 20703. DOJ attempts to obscure this language as well by repeatedly deploying an ellipsis in lieu of these qualifying terms. *See* ECF No. 5-1 at 1, 4. But these qualifiers are important—each describes discrete documents *submitted by a voter* and other things done *by a voter*, which is dissimilar to a computerized statewide voter list created *by election officials* through compiling data from many underlying documents. *See Fischer*, 603 U.S. at 487 ("[A] word is given more precise content by the neighboring words with which it is associated." (citation modified)).

Fundamentally, Title III is an inapt tool for obtaining statewide voter registration lists—records that oftentimes did not even exist prior to enactment of HAVA in 2002, which first tasked states with creating "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). And even then, Congress made clear that the list was to be maintained "at the State level." *Id.*; *see also* H.R. Rep. No. 107-329, at 31–32 (stressing the importance of maintaining "the dispersal of responsibility for election

administration," to make it "impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome"). DOJ's present effort to reverse HAVA's purposeful dispersal of responsibility and to instead centralize voter lists with federal government thus runs headlong into Congressional intent. That effort finds no support in Title III, which simply was not designed to grant DOJ access to state computer databases that would not exist until decades after Title III was enacted.

### C.    DOJ lacks a proper basis and purpose to demand Title III records.

Even if Title III could be read to include Maine's statewide voter registration list as a covered record or paper, the law further requires DOJ to articulate a "basis *and* purpose" for demanding records. 52 U.S.C. § 20703 (emphasis added). DOJ's demands fail on both counts.

*First*, DOJ has not even bothered to try to articulate any basis to believe that Maine has denied the right to vote or otherwise violated federal law. To the contrary, Maine answered DOJ's questions about its list maintenance efforts in detail. *See* ECF No. 1-2. DOJ declined to pose follow-up questions. *See* ECF No. 1-3 at 1. And its complaint does not allege Maine's list maintenance efforts are not "reasonable," which is all that the NVRA requires of Maine. 52 U.S.C. § 20507(a)(4); *see also id.* § 21085 (committing "specific choices on the methods of complying with" HAVA "to the discretion of the State"). "Simply put, [DOJ's demand] does not identify what conduct, it believes, constituted an alleged violation." *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458–59 (5th Cir. 2018) (quashing civil investigative demand that failed to provide basis for investigation).

The lack of any stated basis for investigating Maine is further highlighted by the fact that DOJ has made carbon copy demands to over 39 other states and has sued 17 others based on similar allegations. *See supra* Background § III. This nationwide effort to collect state voter registration lists undermines any notion that DOJ has a "basis" for investigating Maine specifically.

*Second*, DOJ's stated purpose for issuing the demand to Maine—to "ascertain Maine's compliance with the list maintenance requirements of the NVRA and HAVA," ECF No. 1-3 at 2—is not sufficient under Title III, which is meant to permit DOJ to review voting records for "question[s] concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see CFPB v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 690 (D.C. Cir. 2017) (rejecting "perfunctory" statement of purpose in issuing civil investigative demand, reasoning agencies "are not afforded unfettered authority to cast about for potential wrongdoing" (internal quotation marks omitted)). That is, Title III's "purpose is to enable the Attorney General to determine whether" a suit to enforce the CRA is appropriate, *Lynd*, 306 F.2d at 228—not to ascertain compliance with distinct laws serving separate purposes with their own enforcement mechanisms and—in the NVRA's case—disclosure provisions. The Court should thus reject DOJ's efforts to justify its demands with a purpose disconnected from the statutory scheme. *See In re Subpoena No. 25-1431-014*, No. MC 25-39, 2025 WL 3252648, at *17 (E.D. Pa. Nov. 21, 2025) (rejecting subpoena seeking private health information when DOJ "invoke[d] sweeping needs" for the information "far removed from those claimed purposes granted by Congress"); *In re Admin. Subpoena No. 25-1431-019*, No. 1:25-MC-91324-MJJ, 2025 WL 2607784, at *5–7 (D. Mass. Sep. 9, 2025) (similar).

Prior enforcement of Title III closer in time to the law's enactment confirms that it is meant to be used only for investigating the denial of voting rights. Courts at that time upheld DOJ demand letters that stated they were "based upon information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting within your jurisdiction." *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); *see also Lynd*, 306

F.2d at 229 n.6 (same). DOJ has yet to cite a single instance in which Title III has been used to demand records to assess state compliance with the NVRA or HAVA.

### D. Title III does not prohibit redacting sensitive voter information.

Finally, even if the Civil Rights Act could reach statewide voter lists created by the states themselves, and even if DOJ could use Title III's investigative powers to ascertain compliance with federal laws other than the Civil Rights Act itself (both dubious propositions), Title III still does not require the production of *sensitive and personal voter information*. Thus, Maine cannot be compelled under that Act to produce the materials DOJ demands.

The First Circuit has squarely held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" voter files, such as driver's license numbers, partial social security numbers, and dates of birth. *PILF*, 92 F.4th at 56. Similarly, nothing in the text of Title III prohibits the redaction of such information. Indeed, Title III is intended to reach *only* "public records which ought ordinarily to be open to legitimate reasonable inspection," *not* "confidential, private papers and effects." *Kennedy*, 306 F.2d at 231. But the information DOJ demands here is safeguarded from prying eyes under both federal and state law. *See, e.g.*, 21-A M.R.S.A. § 196-A(1); 5 U.S.C. § 552a; 18 U.S.C. § 2721. And since driver's license numbers and partial social security numbers were not required to be provided on registration forms until 2002, *see* 52 U.S.C. § 21083(a)(5)(A)(i), the Congress that enacted Title III could not have possibly intended it to require disclosure of such information. *See Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 47 (1983) (interpreting statute to avoid result that "Congress could not have expected").

### CONCLUSION

For the reasons above, Intervenors respectfully request that the Court dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

December 12, 2025

Respectfully submitted,

*/s/ Elisabeth C. Frost*
Elisabeth C. Frost*
Christopher D. Dodge*
Branden D. Lewiston*
Tori Shaw*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW
Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
efrost@elias.law
cdodge@elias.law
blewiston@elias.law
tshaw@elias.law

James G. Monteleone
**BERNSTEIN SHUR**
100 Middle Street/PO Box 9729
Portland, Maine 04104-5029
jmonteleone@bernsteinshur.com

*Appearing *Pro Hac Vice*

*Counsel for Intervenors John Schneck and Marpheen Chann*